MEEHAN et al. v. NELSON et al.

(Circuit Court of Appeals, Ninth Circuit. May 8, 1905.)

No. 1,125.

1. CONTRACTS—CONSTRUCTION—PERFORMANCE.

Where defendants contracted to convey a half interest in a certain mining claim, in consideration of plaintiffs sinking three holes to bedrock on certain lines, the contract did not require that the entire bottom of each hole should disclose bedrock, but was complied with if any part of each hole extended to bedrock.

2. SAME—EVIDENCE.

In a suit for specific performance of a contract to convey a certain interest in a mining claim in consideration of complainants sinking three holes to bedrock, evidence *held* to sustain a finding of performance by complainants.

3. SAME—SPECIFIC PERFORMANCE—DISCRETION.

Where defendants contracted to convey a half interest in a mining claim, in consideration of complainants sinking three holes thereon to bedrock, a decree for specific performance, on complainants having fully complied with their contract, was a proper exercise of discretion, though the property in the meantime had largely increased in value.

Appeal from the District Court of the United States for the Third Division of the District of Alaska.

This suit was brought to enforce the specific performance of a contract, which is set forth in the amended complaint as follows:

"Gold Stream, Feb. 6, 1903.

"This is an agreement between M. Meehan and T. Larson of the first part and O. A. Nelson & G. N. Hensley of the second part. In consideration of sinking three holes to bedrock on or near the lines of Three and Four Above

Dis. on Fairbanks, trib. of Fish of Fairbanks Mining District of Alaska. In consideration they receive one-half interest in No. 3 Above Dis. on Fairbanks Cr.                                                                        M. Meehan.

"Work to begin immediately. In case of water driving them out will extend time until July 1, 1903.                                                 M. Meehan.
                                                                        "T. Larson."

It is alleged that plaintiffs performed all the conditions of said agreement previous to the time fixed for the performance thereof; that demand was made upon defendants to execute a conveyance of the interests mentioned in said agreement, and that they refused so to do.

The cause was tried before the court, and the court, having fully considered the matter, found the following facts:

"(1) That at the time of the commencement of this suit defendants owned and were possessed of that certain placer mining claim described in plaintiffs' complaint, and containing 20 acres.

"(2) That on the 6th day of February, 1903, plaintiffs and defendants, M. Meehan and T. Larson, entered into the agreement mentioned in said complaint, and that at the time said agreement was made defendants owned and were possessed of the placer mining claim therein described, to wit, placer mining claim 'Number Three Above Discovery,' on Fairbanks Creek, Alaska.

"(3) That immediately thereafter plaintiffs commenced the performance of their part of said agreement, and continued, until they completed same, in putting three holes to bedrock on said claim as therein provided, within the time and at the places therein designated, and that plaintiffs performed all the conditions of their agreement with the defendants to be performed under its terms.

"(4) That immediately after the completion of said agreement plaintiffs notified defendants M. Meehan and T. Larson of the completion of same, and demanded of defendants, prior to the commencement of this action, a conveyance of said one-half interest in said mining claim, which demand was by the defendants never complied with.

"(5) That the defendants, after the completion of the sinking of three holes by plaintiffs under their contract, and without inspecting said work, promised plaintiffs to make said conveyance, but delayed, neglected, and failed to make the same and to examine and inspect said work until it was impossible so to do by reason of said holes having caved in and filled with water, when defendants refused to convey said interests in said claim to said plaintiffs upon their request so to do, and which request was never by the defendants complied with.

"(6) That at the times hereinbefore set forth the defendants were, and ever since have been, in possession of said mining claim.

"(7) That during said time defendants have worked and mined said claim through laymen, and have collected and received all the royalties, rents, and profits of the said described premises, amounting in the whole to three thousand dollars.

"(8) That prior to the filing of the amended and supplemental complaint herein plaintiffs demanded of the defendants an accounting of said royalties and of the payment to them of their share of the same, and that defendants refused to make said accounting, and to make payment to plaintiffs of their share of the same."

As conclusions of law from the foregoing facts the court found:

"(1) That plaintiffs performed all of the conditions of their agreement with the defendants to be by them performed.

"(2) That plaintiffs are entitled to prevail herein and to a decree of this court decreeing a specific performance of said agreement, and to a conveyance of one-half of the claim described herein.

"(3) That defendants are estopped from questioning plaintiffs' rights to said premises under said agreement by reason of the facts stated in the fifth paragraph of the findings of fact herein.

"(4) That the plaintiffs are entitled to a judgment and decree for one-half of the rents and royalties collected and received by the defendants, M. Meehan and T. Larson, and for their costs and disbursements in this behalf expended."

A decree was entered in favor of the plaintiffs, in accordance with the findings, from which decree this appeal was taken.

There are 11 assignments of error, to the effect that the court erred in its several findings of fact and conclusions of law, the pivotal point being "that the facts proven by the evidence produced at the trial of said cause were not sufficient to support said decree."

John Garber, Sidney V. Smith, and Claypool, Stevens & Cowles, for appellants.

H. J. Miller (T. C. West, of counsel), for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement, delivered the opinion of the court.

Appellants claim that "the finding that plaintiffs performed the work is wholly unsustained by the evidence." It will be observed that under the contract the three holes were to be sunk to bedrock. Counsel for appellants admit that the testimony in relation to holes 1 and 2 is clear, positive, direct, and certain. They were sunk "to bedrock." The controversy between the parties is confined solely to hole 3. Was it sunk to bedrock?

O. A. Nelson, one of the plaintiffs in the court below, testified, among other things, as follows:

"Q. Did you do anything under that arrangement in the way of carrying out the agreement? A. I fulfilled the contract."

It is argued that this answer was a mere conclusion of law, not constituting any legal evidence which this court should consider as tending to show the fact that the hole was sunk to bedrock. The record shows that no objection was made by defendants to this answer as being a mere conclusion. No motion was made to strike the testimony out, and no questions on cross-examination or otherwise were asked the witness by either party as to what he meant by his statement, "I fulfilled the contract." Of course, the contract could not have been fulfilled unless the hole had, as a matter of fact, been "sunk to bedrock." If any inference is permissible from the conclusions given by the witness, it would be that the hole was sunk to bedrock. Without stopping to inquire whether the appellants would be estopped by such testimony given, without objection on their part being taken at the trial, and conceding for the purposes of this opinion that the objections to this testimony can now be raised on appeal and exceptions taken, we proceed to examine further testimony given by this same witness, viz.:

"A. After the work was done I went over on Captain Creek one trip; that was on the 6th of March. Q. State how soon after that you met Meehan and Larson? A. We started to pull out of there the 7th, * * * and on the 8th we got out as far as the mouth of Twin. I think at Golden City on the 8th or 9th we saw Meehan and Larson. Q. State what took place there. A. We told them that the work was done and told Meehan * * * I supposed they would like to go and investigate, and he told me: 'I guess the work is all right. When you go into town make out your papers, and some time when we both come in we will sign them. * * *' Q. What did you do next with regard to making out the papers according to Mee-

han's instructions? A. * * * I think it was on the 16th of May the papers were made out, although I saw Meehan before that time in town, and told him we hadn't got the papers made out yet. Q. When did you see him next? A. The next I saw him after I got the papers, that was some time in June. I went out on purpose to see him. Q. State what happened on that occasion. A. Why, he had told me before that they were going to bale the water out of the holes, and see whether they were to bedrock or not, and I told him to go ahead. I expected they had done that when I went out there with the papers, but he said he hadn't done it, and was going out to do the work."

Again, in the further course of his examination the following question and answer appear:

"Q. Will you state the depth to bedrock? A. The first hole was a strong 16 feet deep and one foot down in the bedrock. The second hole is 17 and some inches to bedrock, I think 3 inches or something like that—anyway, it is a strong 17 feet; and the other one is 22 feet or about that."

We are unable to accept the statement of the learned counsel for appellants "that this answer asserts nothing more positively than that the first hole went down a foot into bedrock, that the second hole went to bedrock, and that the third hole was 22 feet deep." The answer must be considered with reference to the question asked as to the depth of the three holes to bedrock. To answer the question the statement of the witness as to the first hole being "one foot down in the bedrock," and the second hole "to bedrock," was mere surplusage, and it was unnecessary for the witness to repeat the words "to bedrock" in respect to the third hole in order to complete the answer to the question as asked. Suppose the question had been asked, "What was the depth of the third hole to bedrock?" and the answer given, "22 feet or about that." Would not that have been a complete, direct, and positive answer to the question? The question was a leading one, but no objection was taken to it, and the answer must be accepted as evidence.

This is the only positive and direct evidence on this point. In this connection it is deemed proper to state that the evidence in the record shows clearly that the defendants, having been informed by the plaintiffs that they had fulfilled the contract, took no steps to visit or examine the holes with the view of satisfying themselves that the contract had or had not been completed until about five months after such information was given, and then the banks of the holes were caved in, and the facts could not be ascertained by an investigation of the holes. In the meantime, according to the testimony of the defendants, "property constantly increased in value on Fairbanks Creek from the time these shafts were sunk." It was some time in November, 1903, when defendants "felt pretty certain that the contract was not fulfilled"; they heard reports "that there was something that was not what it ought to be." So defendants concluded to sink shafts near the holes sunk by plaintiffs, and went down to bedrock to run drifts under the holes sunk by plaintiffs, in order to ascertain whether or not such holes had been sunk to bedrock. The greater portion of the testimony on both sides was in relation to this work. The testimony of plaintiffs tended to show that the drifts did not run under or to the shafts sunk by plaintiffs,

while the testimony of defendants tended to show that they did. Upon this point there was a wide diversion of opinion. Steelsmith, a witness for plaintiffs, speaking of the holes and drifts sunk and run by defendants in relation to holes 1, 2, and 3 sunk by plaintiffs, said:

"It seemed that there was more variation in hole number 3 than there was in number 2. While the drift was not so long there, there was a doubt left in my mind as to whether the drift ran under the shaft, or as to whether it reached the shaft. Q. How much variation was there? A. I could not say as to that. There was plenty of space for the Nelson shaft to have been to bedrock. Q. Why did you think that? A. * * * If this shaft should have been to bedrock, the width of the drift would not take in the width of the shaft, so that, while there was no indication there on the face of the side wall of the drift showing that they had been disturbed, it still left space in the bottom of that shaft, according to my notion, that that shaft could have been to bedrock without this drift proving that it was not. Q. The drift didn't strike the old shaft? A. No, sir; it ran to the left. While there was nothing to prove that it was to bedrock, I didn't consider that the drift underneath it would give it a fair test to prove that it was not."

Gibbs, speaking of the variation, said:

"At the back end of the hole it must have varied at least three feet. We obtained the direction of that hole. * * * I placed the stick in the bottom of the hole, looking right at the center of the drift on the back, and left the candle there, and when I got on top there was the stick pointing off to the left, and there was Nelson's hole to the right of the stick."

Crabbe testified:

"We went to hole No. 3, and measured that from the top—put the same stick across to get the center location of the hole. It was 22 feet and 8 inches deep. The length of the drift was 10 feet 4 inches as it ran in, and, as near as we could come to telling from our pole on the top, it was bearing off to the left. Q. How much? A. About 4 or 5 feet anyway—at the least; I could not exactly tell. * * * Q. Could you tell whether it would strike the Nelson and Hensley shaft from what you saw? A. I should not judge myself that it would strike the Nelson and Hensley shaft at all."

To illustrate the character of the testimony upon the part of the defendants as to the work done by them, we take the witness Boss, who had taken a lay from defendants on a part of the ground. He testified that the drift in shaft 2 bore a little to the left of hole 2:

"In a distance of 12 feet I should judge it was about 15 or 18 inches. Q. Where did it strike the old shaft? A. Under the up-hill end of the shaft. Q. How much of the old shaft did it expose? A. I don't know."

With reference to shaft 3, sunk by defendants, he said:

"The hole was sunk 23 feet and 3 inches, and the drift was driven 11 feet and 6 inches. * * * Q. How did this drift compare with reference to the old shaft? A. As near as I could judge, exactly to the center. * * * Q. What was the result of the exposure made at any part of this drift with reference to the old shaft? A. Well, we didn't see anything that looked like an old shaft there. It was what I supposed to be solid gravel."

In his cross-examination he said that they ran a drift 11 feet "to be sure we had got over far enough" to reach the hole sunk by Nelson and Hensley. The drift which was run was larger at the starting point than it was at the end.

"Q. Did you enlarge that hole and widen it so there would be no chance of your missing it? A. No, sir."

Zeimer, a witness for the defendants, testified that he went into shaft 3, and measured the drift back about 11 feet and a half.

"We went there to find out whether this drift ran under the other shaft, and we lined it up with the other shaft. * * * We put a pole down the bottom, and lined it up on top the same way. * * * Found out that they were in line. Q. Did you make any examination of the drift with reference to that shaft, to see what that showed as to bedrock? A. I could not say whether that goes to bedrock or not. I didn't have no pick."

After the conclusion of the testimony the court desired "more accurate information in relation to the location of the shafts sunk by Nelson and Hensley on the upper end of the mining claim 'Number Three Above Discovery,' on Fairbanks Creek, in controversy; and the court, deeming it important to ascertain accurately whether or not the shafts so sunk by Nelson and Hensley, and called 'Numbers Two and Three' in the evidence in this case, were sunk to bedrock, and whether or not the drifts running from the new shafts Numbers Two and Three, alongside the old, bore to the left and missed the old shafts, or actually went under them; and, all parties to the litigation in open court consenting thereto," the court appointed R. A. Jackson, a qualified and expert surveyor, "to make an accurate survey of the said old shafts Numbers Two and Three, and the drifts running therefrom toward or underneath the old shafts on said mining claim Number Three in litigation, for the purpose of determining accurately their position with regard to each other," etc. Jackson, as referee, thereafter, on August 1, 1904, reported to the court that he made a survey of the new shaft Number Three and the tunnel, and "found that it would tap the Nelson shaft Number Three nine-tenths of a foot from the south end of said shaft, crossing the east side line and penetrating under the shaft one and one-tenth foot, at an elevation of two and two-tenths feet from bedrock."

It is apparent from the decree rendered by the court that it did not consider the report of the surveyor established the fact, as claimed by the appellees, that hole No. 3, sunk by Nelson and Hensley, did not go to bedrock. The bedrock at the bottom of the holes was not level. The contract did not require that the entire bottom of the holes should disclose bedrock. If any part of the hole went to bedrock the contract was complied with. The fact that a tunnel run from the new shaft Number Three would tap the Nelson shaft, as stated in the report, does not prove that the Nelson shaft or hole Number Three was not sunk "22 feet or about that" to bedrock.

In equity causes the rule is well settled that the findings of the court below upon the facts are to be taken as presumptively correct, and unless an obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, the decree should not be disturbed. Warren v. Burt, 58 Fed. 101, 106, 7 C. C. A. 105; Stuart v. Hayden, 72 Fed. 402, 408, 18 C. C. A. 618; Snider v. Dobson, 74 Fed. 757, 21 C. C. A. 76; Denver, etc., R. R. v. Ristine, 77 Fed. 58, 23 C. C. A. 13; Lansing v. Stanisics, 94 Fed. 380, 36 C. C. A. 306; Harding v. Hart, 113 Fed. 304, 51 C. C. A. 264; Lilienthal v.

McCormick, 117 Fed. 89, 97, 54 C. C. A. 475; Tilghman v. Proctor, 125 U. S. 136, 149, 8 Sup. Ct. 894, 31 L. Ed. 664; Crawford v. Neal, 144 U. S. 585, 596, 12 Sup. Ct. 759, 36 L. Ed. 552; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821, 36 L. Ed. 649; Warren v. Keep, 155 U. S. 265, 267, 15 Sup. Ct. 83, 39 L. Ed. 144.

After a careful examination of all the evidence, we are unwilling to say that the court below committed any mistake in the consideration of the evidence applicable to the points under discussion, or the conclusion which it deduced therefrom. The court had the witnesses before it, and had knowledge of the conditions existing in the vicinage where the holes were sunk, and was, in the very nature of things, better able to understand and apply the testimony of witnesses than we are.

It is true that specific performance, as claimed by appellants, is not a matter of absolute right, but rests entirely in judicial discretion, to be exercised according to the settled principles of equity so as to reach the ends of justice. Snow v. Nelson (C. C.) 113 Fed. 353, 356; Willard v. Tayloe, 8 Wall. 557, 19 L. Ed. 501; Story, Eq. Jur. § 742.

As is said in 26 Am. & Eng. Ency. Law (2d Ed.) 67:

"It must appear that the contract is fair, just, and equitable in all its parts. If, therefore, a decree of specific performance would work hardship or injustice upon the defendant, or operate oppressively upon him, a court of equity will decline to interfere."

The contract was fair and just between the parties, and the record herein does not show that its enforcement would work any hardship or injustice upon the defendants. The fact that it was shown by the complaint that one McMahon had an interest in the premises did not deprive defendants from establishing their rights, if any they had, as against the plaintiffs herein, and the record shows that in the answer of McMahon he asks that his interest in the premises "be not determined in this action."

The decree of the District Court is affirmed, with costs.