### NYGARD et al. v. DICKINSON et al.
#### No. 8640.

Circuit Court of Appeals, Ninth Circuit.

May 24, 1938.

54

W. C. Arnold and L. O. Gore, both of Ketchikan, Alaska, for appellants.

Ziegler & King, of Ketchikan, Alaska, for appellees.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

The appellees, as plaintiffs, brought suit against the appellants, praying that they be decreed the owners of an undivided one-third interest in certain mining claims situated in Alaska; that they be decreed entitled to an undivided one-third interest in the sum of $30,000 agreed to be paid by defendant Evis Corporation to defendants Nygard and Nuckolls, in payment of the purchase price of said mining claims.

At the trial the following facts were brought out:

In 1904 Gunder Nygard located a mining claim which he named the "Goo Goo", near Sea Level, Thorne Arm, in the Ketchikan Mining and Recording District, First Division, Territory of Alaska. In 1907 Richard Nuckolls located a claim known as the "Goo Goo No. 1", or "Goo Goo Extension", or "United States". Gunder Nygard and Richard Nuckolls had been friends since 1900 and these claims were adjacent. Before locating the No. 1 or Extension, Nuckolls acquired an interest in the Goo Goo claim. Nuckolls had agreed with Nygard in 1904 to purchase the Goo Goo claim for $12,000, but did not pay all of the purchase price. After Nuckolls acquired the Extension another agreement was entered into whereby they put the two claims together and became partners. After acquiring an interest in the Goo Goo claim he and Nygard gave an option to other parties to mine the property, but these persons did not continue operations. Afterwards Nuckolls and Nygard conducted mining operations and took out considerable gold. Between 1908 and 1922 this mining property was leased to several people and from twelve to eighteen thousand dollars worth of work was done on the two claims. Nuckolls said that there was always a dispute over the property.

Gunder Nygard left Alaska in 1910 and at the time of the trial was over seventy years of age and resided in the State of Washington. He did not testify either as a witness, or by deposition. Nuckolls transacted all business relative to the claims after Nygard left Alaska and advised Nygard from time to time of his acts and received Nygard's approval.

On June 22, 1922, pursuant to an agreement with the appellees, Nuckolls signed the following memorandum: "This is to certify that as half owner and having power of attorney from Gunder Nygard, I hereby agree to give Doctors G. E. and B. P. Dick-

inson one third interest in all claims we possess at Sea Level, Thorne Arm, Alaska, if they will obtain a patent for the same and do the assessment work for this year up to July, 1922. Should they not obtain a patent the assessment work is to be paid for out of the first gold obtained." This writing was witnessed, acknowledged and recorded. The Dickinsons proceeded to do the assessment work in 1922 and 1923, but did not obtain a patent. For the following six years, between 1924 and 1930, the Dickinsons did no assessment work and made no effort to get a patent, although Dickinson made numerous trips to the property with Nuckolls, using his power boat, and furnishing the gasoline, oil and food. In 1928 Dr. Dickinson made a trip to Seattle at Nuckolls' request with the purpose of selling or leasing the claims. Nuckolls was there and Dickinson paid all the expenses for ten or twelve days. Nuckolls never repaid the money spent on the Seattle trip. During that period the assessment work was done by Nuckolls. The Dickinsons had been interested with Nuckolls in mining claims at Helm Bay since the year 1914.

In June, 1930, the Dickinsons secured the services of William Hesse, a Territorial Highway Engineer, to survey the mining claims at Thorne Arm for the purpose of obtaining a United States patent. On June 15, 1930, George Dickinson took Mr. Hesse and Nuckolls to the claim and left Hesse there, returning to Ketchikan. Shortly thereafter Hesse returned to Ketchikan, complaining that he had no one to assist him. On June 21st the party again set out in Dickinson's boat, taking along an extra man to help in surveying the claims. When the boat had traveled only a short distance from the shore, Nuckolls and Hesse engaged in a heated argument, and Hesse demanded to be put back on shore. Dickinson had taken no part in the argument. Dickinson put the boat back to the dock and the party landed. Hesse testified at the trial, "Nothing that G. E. Dickinson or Mrs. B. P. Dickinson said or did, in any manner contributed to the decision I made to turn back to town and to refuse to make said survey. It was the fault of Richard Nuckolls." On the same day Nuckolls advised Mrs. Dickinson that there were only a few days remaining before June 30th, 1930 to do the assessment work for that year. Nuckolls secured five men to do the work and the Dickinsons agreed to pay the expenses, and

furnish the food, supplies and transportation. Mrs. Dickinson testified that on June 25th Nuckolls advised her and Dr. Dickinson that they were to have a one-third interest in the mine in return for doing the assessment work for 1930. Dr. Dickinson said that he understood that by the agreement of June 25, 1930, he was relieved of the necessity of procuring the patent. Nuckolls denied this agreement and stated that the Dickinsons were to procure the patent to entitle them to a one-third interest, but said that he believed Dr. Dickinson tried in good faith to have the survey completed in 1930.

The Dickinsons also caused the assessment work to be done in 1931, securing the services of W. E. Green and his son and furnishing them with supplies. Green gave them a certificate for $200 worth of assessment work for the year 1931. Green was living at the time in a house owned by the Dickinsons and the rent was applied against the value of his services over a period of twenty months. The Dickinsons paid him in rent.

Thereafter the Dickinsons did no more assessment work. In 1935 Dr. Dickinson learned, for the first time, that the claims had been sold by Nuckolls and Nygard to the Evis Gold Mines Corporation. The Dickinsons then sent a notice to Nuckolls, Nygard, Alaska Ketchikan Gold Mining Company and Evis Gold Mining Corporation, of their claim to an interest in the property. On August 23, 1935, George Dickinson sent a letter to Nuckolls notifying that he was ready to proceed to obtain a patent and requesting advice whether Nuckolls considered the contract between them in force or not.

It was brought out in the testimony for the defendants that the Evis Corporation took an option to purchase the property for $30,000 in 1933 and commenced to work it in October, 1934, and up to the time of trial had spent approximately $80,000 developing it, and had paid defendants, Gunder Nygard and Richard Nuckolls, $19,500 and deposited in a bank in Ketchikan, pursuant to order of court, $4,000.

Nuckolls denied that he agreed to give the Dickinsons a one-third interest in the claims for doing the assessment work for 1930 but said that he agreed to give a one-third interest if they procured a patent. He said further that he told Dickinson that he would renew the contract if he would do the assessment work and get the patent

"and when he didn't get the patent naturally he had to do the assessment work."

The Evis Gold Mines Corporation agreed to pay thirty thousand dollars for the Goo Goo claim and nothing for the Goo Goo Extension claim, according to Nuckolls' testimony.

Questioned on the agreement of June 22, 1922, Nuckolls testified that he had a power of attorney from Nygard; that the power of attorney might have run out or been destroyed by him; that he wrote Nygard of the agreement; that Nygard knew all about it; that Nygard wrote him that the agreement was satisfactory; and that he (Nuckolls) no longer had the letters. Counsel for the defendants made no objection to this testimony but did move to strike it on behalf of Gunder Nygard.

Nuckolls decided to rescind the contract and deny any rights to the Dickinsons at the time he gave an option on the claims to one Olson in 1933; Dr. Dickinson, so Nuckolls testified, wanted to sign the option agreement with Olson, as a partner but that he refused. Nuckolls said, however, that he did not stop the Dickinsons from getting a patent, but that they could have secured a patent right up until he sold the claims, without objection from him.

At the conclusion of the trial the court delivered an oral opinion; findings of fact and conclusions of law were entered May 20, 1937; and decree entered in favor of plaintiffs, on the same day.

The appellants assign twenty-seven errors, eleven of which are not relied upon. The remaining assignments are divided by appellants into five groups, but we do not find it necessary to confine ourselves to this grouping.

The facts as pleaded and proven sustain the findings and judgment of the court. Nygard never turned his hand or spent a cent to preserve or improve the property after 1910 and all that saved Nuckolls, and incidentally Nygard too, from loss of the claim on several occasions were the Dick-

insons and their continued readiness to advance the necessary money. Were it not for certain legal questions raised, affirmance would be a mere matter of course.

It is argued that Nuckolls was without power to bind Nygard—a question perhaps technical or formal, possibly fundamental. We, therefore, proceed to a discussion of the authority of Nuckolls as an agent, and if no such authority is shown, does the conduct of Nygard establish ratification or estoppel.

A mining claim is property in the fullest sense of the word, and may be sold, transferred, mortgaged, and inherited without infringing the title of the United States, and when a location is perfected, it has the effect of a grant by the United States of the right of present and exclusive possession[1] so long as it is kept alive by the performance of the required annual assessment work.[2] Although it is possessory in character[3] and no written intrument is necessary to create it,[4] it is, nevertheless, real property[5] and a written instrument is necessary to convey an interest therein.[6]

The Supreme Court of the United States, in Union Consolidated Silver Mining Co. v. Taylor, 100 U.S. 37, 42, 25 L.Ed. 541, held that a written conveyance was not necessary to the transfer of a mining claim and this holding was followed in Miller v. Consol. Royalty Oil Co., 8 Cir., 23 F.2d 317, 320. While this holding of the Supreme Court is squarely in point, we prefer not to rest our decision thereon, for the reason that it was decided in the October Term, 1879, and the case upon which the statement was based—Table Mountain Tunnel Co. v. Stranahan, 20 Cal. 198—is no longer the law in California. Besides, the later cases support the rule expressed in the preceding paragraph,—that a mining claim is real property and a written instrument is necessary to the conveyance thereof.

Did the plaintiffs have a written instrument upon which this action could be founded?

---

[1] Manuel v. Wulff, 152 U.S. 505, 510, 14 S.Ct. 651, 38 L.Ed. 532; Bradford v. Morrison, 212 U.S. 389, 395, 29 S.Ct. 349, 53 L.Ed. 564;

[2] Cole v. Ralph, 252 U.S. 286, 295, 40 S.Ct. 321, 64 L.Ed. 567;

[3] Trinity Gold Dredging & Hydraulic Co. v. Beaudry, 9 Cir., 223 F. 739, 742;

[4] Black v. Elkhorn Mining Co., 163 U.S. 445, 450, 16 S.Ct. 1101, 41 L.Ed. 221;

[5] Cascaden v. Dunbar, 2 Alaska 408, 411; McQuillan v. Tanana Electric Co., 3 Alaska 110, 117; Manuel v. Wulff, supra; Bradford v. Morrison, supra; 40 C.J. 815, § 236;

[6] Cascaden v. Dunbar, supra; 27 C.J. 203, § 153; Section 4315(5) Compiled Laws of Alaska (1933).

See also, generally, Lindley on Mines, 3d Ed., Vol. 1, p. 618, § 270; Ricketts American Mining Law, 1931, p. 580, § 1133.

**57**

The written instrument of June 22, 1922, was witnessed, acknowledged and recorded, and would appear to answer the requirement of the Statute of Frauds [7] as being a memorandum signed by the party to be bound, if Nuckolls had the authority to bind Nygard. Of course, so far as Nuckolls' interest was concerned he was bound thereby. There was testimony that the Dickinsons were already doing the assessment work on the claim at the time the memorandum was signed and there is no dispute as to the identity of the property concerned. The Dickinsons did the assessment work for the year ending June 30, 1922, so that there was part performance on their part, which would obviate the necessity for their signature appearing on the memorandum. They also had the assessment work performed for 1923. The instrument recites and Nuckolls testified that he had a written power of attorney from Nygard and, in addition, that he had received letters from him confirming or ratifying the agreement and that Nygard knew the Dickinsons did the assessment work for 1922. Nygard's answer to the complaint put in issue the plaintiff's allegation, that Nuckolls in the matter of this contract was "acting for himself and his co-partner Gunder Nygaard, and as attorney in fact for said Gunder Nygaard,". Nuckolls' testimony, supporting these facts and not controverted by any testimony or deposition from Nygard, leaves no alternative but to conclude that Nuckolls did have a power of attorney from Nygard, in addition to being his partner and a co-tenant in the claim with him. The allegations of the complaint fully apprised Nygard that the plaintiffs would try to prove Nuckolls was his agent, but he chose not to testify. His co-partner Nuckolls, freely admitted the agency, and testified as to the written power of attorney and letters of ratification.

Appellants call attention to section 4315 of the Compiled Laws of Alaska (1933), which provides that the authority of an agent to enter into an agreement concerning real property must be in writing. The power of attorney from Nygard to Nuckolls furnished such authority and although the instrument itself was not in evidence its existence was conclusively established. Nuckolls, although a principal in so far as his own interest in the property was concerned, also represented himself to be, and purported to act, as agent for Nygard by virtue of this power of attorney.

He testified that he had such a power of attorney from Nygard, but that it had been destroyed or had expired at the time of the trial; also that he had written Nygard of his action in entering into the contract of June 22, 1922, with the Dickinsons, and had received a reply that it was satisfactory, but that he did not have the letters. There was no testimony to the contrary. The declarations of an agent made out of court are inadmissible to prove his agency, but "The direct testimony of an agent on the witness stand is admissible to prove his authority and the extent thereof." 3 C.J.S. p. 287, Agency, § 324. See Attleboro Mfg. Co. v. Frankfort Marine, etc., Ins. Co., 1 Cir., 240 F. 573, 581; Handley v. Johnson, 104 Cal. App. 606, 286 P. 428; Sierra Paper Co. v. Mesmer, 45 Cal.App. 667, 188 P. 605. It must be kept in mind that Nuckolls testified that it was his duty under his agreement with Nygard, to preserve and protect their rights and interest in the mining claims by doing or having done the annual assessment work required by the statute. We have been cited to no cases holding that the law requires persons dealing with an agent to secure from him or the principal, a writing signed by the principal, which they must preserve and use as evidence in court should the occasion arise. Nygard did not specifically deny Nuckolls' authority.

Further, the principles of estoppel bind Gunder Nygard to the contract of June 22, 1922. There was positive testimony by Nuckolls that Nygard knew of the contract. Let it be argued that the declarations of the agent are not admissible to prove his authority, let it be argued that the declarations of the agent are inadmissible to prove ratification of his acts by the principal, we still have this testimony that Nygard knew of the work being performed by the Dickinsons, knew of the contract and did not repudiate it, while accepting the benefits of the work done. "The principal may be estopped by his acts and conduct to deny the authority of an agent, notwithstanding there is, technically, no valid ratification by reason of the fact that in the particular case a particular form of ratification is necessary." 2 C.J.S. p. 1089, Agency, § 45.

In 1928 Dr. Dickinson made a trip to Seattle, Wash., at Nuckolls' suggestion to confer with prospective purchasers and though the expedition came to naught, he bore the expenses. There was no repudia-

---

[7] § 4315, Comp.Laws of Alaska.

58

tion because, as Nuckolls testified, the patent could have been procured up to the date of the giving of the option to the Evis Corporation. The employment of Hesse, which preceded the oral agreement of June 25, 1930, was an offer in good faith to perform on the part of the Dickinsons, which was prevented by Nuckolls. All these facts show that the original written agreement was still in force and effect and never repudiated and, coupled with the fact of the acceptance of the assessment work in 1930 and 1931, well established plaintiffs' case.

In view of the offer of performance made in good faith, we do not deem it necessary to discuss the question of oral modification of the 1922 contract in 1930.

"In equity causes the rule is well settled that the findings of the court below upon the facts are to be taken as presumptively correct, and unless an obvious error has intervened in the application of the law, or some serious and important mistake has been made in the consideration of the evidence, the decree should not be disturbed. * * *. [Many cases cited.]

"After a careful examination of all the evidence, we are unwilling to say that the court below committed any mistake in the consideration of the evidence applicable to the points under discussion, or the conclusion which it deduced therefrom. The court had the witnesses before it, and had knowledge of the conditions existing in the vicinage * * *, and was, in the very nature of things, better able to understand and apply the testimony of witnesses than we are.

"It is true that specific performance, as claimed by appellants, is not a matter of absolute right, but rests entirely in the judicial discretion, to be exercised according to the settled principles of equity so as to reach the ends of justice. * * *

"As is said in 26 Am. & Eng. Ency. Law, 2d Ed., 67:

" 'It must appear that the contract is fair, just, and equitable in all its parts. If, therefore, a decree of specific performance would work hardship or injustice upon the defendant, or operate oppressively upon him, a court of equity will decline to interfere.'

"The contract was fair and just between the parties, and the record herein does not show that its enforcement would work any hardship or injustice upon the defendants. * * *" Meehan et al. v. Nelson et al., 9 Cir., 137 F. 731, 736, 737.

Affirmed.