## METRO–GOLDWYN–MAYER CORPORATION v. FEAR.

### No. 8991.

Circuit Court of Appeals, Ninth Circuit.

June 6, 1939.

, Loeb & Loeb, Milton H. Schwartz, Lyon & Lyon, Frederick S. Lyon, and Leonard S. Lyon, all of Los Angeles, Cal., for appellant.

Alton & Ratcliff and H. Edward Alton, all of Beverly Hills, Cal. (I. Parker Veazey, Jr., of Los Angeles, Cal., of counsel), for appellee.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

Appellant brought this action to secure a declaratory judgment to determine the rights of appellant and appellee under certain contracts between them. These contracts were in the form of letters, the first of which was directed by the appellee to appellant and dated October 19, 1928, and the second, directed by appellant to the appellee, was dated November 9, 1928. Both letters relate to an invention by appellee of a machine for developing and processing photographic film. Under these contracts the appellee was employed to build, and did build, a developing machine embodying his invention, and granted a license thereby to the appellant to manufacture and use such machines throughout the world. This right to use, however, was limited by the proviso that such machines could not be manufactured nor used "other than for their own use." The principal controversy between the parties is as to the proper interpretation of the phrase "other than for their own use" in the letter of October 19th, signed by the appellee, and the phrase "other than for our own use", contained in the letter of November 9th, signed by the appellant. More concretely, the primary question is whether or not the contract between the parties prohibits the use of such machines to develop film exposed by others and to expose and develop prints from negatives exposed and developed by and for others.

The trial court, in its conclusions of law, held: "That the words 'for our own use' in said agreement dated November 9, 1928, mean for the use of plaintiff in processing the film of its own production, that is to say, treating or processing raw exposed film to produce either and both positives and negatives of pictures made by plaintiff, Metro-Goldwyn-Mayer Corporation, and excludes the use of such machine for hire to process film for any other motion picture producer or producers, excluding also the leasing or renting of such machines directly or indirectly, whether such machines remain in the possession of the plaintiff, or whether their possession is turned over to another."

It also held in the conclusions of law that the agreement of November 9, 1928 conveyed to the Metro-Goldwyn-Mayer Corporation a restricted license for manufacturing such machines for processing film of its own production, and did not convey to appellant any right or license to process any film for any other producer or concern, and that the processing of film for other producers for hire was a breach of the contract.

The declaratory judgment was to the same effect. The plaintiff appeals from the judgment.

The appellant was engaged in the business of producing film for exhibit in moving picture theatres throughout the world. It produced the picture, that is to say, employed the actors and actresses, made the scenes which were photographed. The exposed film was developed and positive prints therefrom were made, developed, processed and distributed to moving picture theatres for exhibition. The appellant had established a laboratory but much of its work, particularly the production of the positive film, known as release prints which were sent to the theatres, was done for appellant by commercial laboratories. Appellant planned to erect larger laboratory buildings and to install therein more extensive equipment for processing film than it had theretofore used. This step was made necessary by the changes in the industry resulting from the reproduction of dialogue and sound effects with the moving picture.

The appellee who was familiar with the problems of a moving picture laboratory, particularly with relation to the development of exposed film, believed that he had overcome one of the difficulties involved in the process resulting from the expansion or contraction of the film while passing through the various liquids used in developing, washing and fixing the film.

In the process of developing, the film is kept constantly in motion through the developing machine, but instead of passing directly through the machine is moved verti-

cally, as well as transversely, through the liquid by passing over a series of rollers, some at the bottom and others at the top of the liquid bath. By this method the film, although moving continuously, is detained for a sufficient length of time in the developing and processing baths to permit the chemical changes necessary to develop the latent image in the film, to wash away the developing and fixing fluid, and also treat the film so that when the film emerges from the machine it is mounted in rolls for use, either in the printing or exhibiting machine.

The appellee had conceived the idea that if the bakalite rollers over which the film passed were mounted loosely upon the spindle, or shaft, around which they revolved there would be sufficient play to prevent the tearing of the film when it shrank and to take up the slack when it expanded. The amount of play in the individual mounting was very small, according to the exhibit shown us, probably not more than one-sixteenth of an inch, but in the aggregate it was believed would provide for such shrinkage or expansion as might occur in the development process.

The appellee had not constructed a developing machine but had satisfied himself from experiments with rather crude devices that his plan would work in practice. He had approached a number of concerns interested in the use of developing machines, but had not been able to secure acceptance of his idea. He approached the appellant and secured the agreement of October 19, 1928, in which he agreed to construct an experimental machine. This agreement is set out in the foot-note.[1] The developing machine thus produced gave sufficient promise of success so that the appellant employed the appellee to construct a larger developing machine which it contemplated using in its business. The appellee, after proceeding with the employment a short time, insisted upon a more definite written statement of the terms of the contract. This was prepared in the form of the letter of November 9, 1928, and is shown in the foot-note.[2]

Appellant contends that the agreement concerning the manufacture and use of the machines was solely a license and, consequently, was a release from any patent monopoly appellee might acquire and that

---

[1] "Hollywood, California, October 19, 1928.

"Metro-Goldwyn-Mayer Studios,
"Culver City, Cal.

"Dear Sir:        Attention Mr. Mannix.

"I am accepting your order No. 3982 for one experimental machine for testing out the principles involved in the design of my Fearless Simplex developing machine. This order is accepted under the following terms which were discussed and agreed to by you, Mr. Nicholas, and myself. These terms are, briefly:

"1. It is strictly understood that in accepting this order from the M. G. M. Co. I do not in any way license the M. G. M. Co. to build any developing or film processing machine using the principles involved in the design of my machine.

"2. The test machine is to be built as cheaply as possible to test out the principles involved, and is not to cost over $400.00. It is understood that I am to be paid for this machine upon delivery to the M. G. M. Studios.

"3. If tests prove that the basic principles of invention are sound and practical, I am to be employed by the M. G. M. Studios under a four months contract at a salary of $250.00 per week to design a complete developing machine embodying my fundamental designs and inventions in developing machines.

"4. It is understood that should I

complete the design of this machine in less than four months I shall devote my time to designing any other machines that the M. G. M. Co. may desire.

"5. It is also understood that the salary paid me shall entitle the M. G. M. Co. to a shop right to build any machines I may develop while in their employ but does not in any way entitle them to any patents or license them to manufacture any of these machines other than for their own use.

"If the above terms are satisfactory and agree with our verbal understanding, will you kindly sign this letter which is in duplicate and return your signed copy to me, so that I may deliver the test machine, which is practically finished, to you. [Sgd] Ralph G. Fear [Sgd] Metro Goldwyn Mayer, E. J. Mannix, Studio Mgr."

[2] "Culver City, California, November 9, 1928.

"Mr. Ralph G. Fear, c/o Metro-Goldwyn-Mayer Corporation, Culver City, California.

"Dear Mr. Fear:

"This will confirm our understanding of the following agreement between us:

"1. You have constructed and delivered to us one experimental machine for testing out the principles involved in the design of your Fearless Simplex Developing Machine, pursuant to our order

the limitation provision of paragraph six of the letter of November 9, 1928 (note 2) was not a contract on the part of appellant to limit its use. It contends that if it used the developing machines outside the scope of the license the only remedy of appellee would be for patent infringement; that no action would lie for breach of contract. We conclude, however, that the words limiting the right to use was a promise or covenant by the appellant to confine its use of the machines to its "own use". If the words were not of themselves a covenant by appellant one would be implied. See, Cassidy v. Evan L. Reed Mfg. Co., D. C., 293 F. 797.

No. 3982, for which experimental machine we agree to pay you a sum equivalent to the actual amount of money expended by you in the construction thereof, as evidenced by vouchers showing your payment of such money, provided, however, that in no event shall we be obligated to pay you more than four hundred dollars ($400.00) for said machine. From the date of delivery of said machine to us, said machine became the sole property of Metro-Goldwyn-Mayer Corporation, its successors and assigns, and you hereby give and grant to said corporation the full and complete power and license to use the same without further consideration or compensation to you.

"2. We hereby employ and engage you to render your services for us in designing and assisting in the construction and supervision of a complete developing machine based upon the experimental machine hereinabove in paragraph 1 referred to and embodying your fundamental designs and inventions in developing machines. The term of your employment hereunder shall commence on November 8, 1928, and shall continue from and after said date for a period of four (4) months. It is understood that you have outside interests which will require your attention a portion of the time during the term hereof, it being agreed, however, that you will render your services hereunder for us for not less than six (6) hours each day during the term hereof, the time at which said services are to be rendered to be designated by us.

"3. It is contemplated that with reasonable diligence you will be able to complete the plans, sketches and designs for said developing machine within four (4) weeks from the date of commencement hereof. Should said plans, sketches, and designs not have been completed to our satisfaction at the expiration of six (6) weeks from the date of commencement of the term hereof, we may, at our option, terminate your employment hereunder. You agree that after you have completed your services in connection with the design and construction of said developing machine, you will, during the remainder of said term, render your services for us in designing and/or constructing such other machines as we may desire and will render such other services as inventor, designer and/or technician for us as we may request.

"4. Provided that you fully, completely and faithfully keep and perform all of the terms, covenants and conditions to be kept and performed by you hereunder, we agree to pay you as compensation in full for your services hereunder and for all rights herein granted and/or agreed to be granted by you, the sum of two hundred fifty dollars ($250.00) per week, to be due and payable on Saturday of each week for services rendered up to and including the Wednesday preceding.

"5. In the event that by reason of mental or physical disability, or otherwise, you shall be incapacitated from fully performing the terms or complying with each and all of your obligations hereunder, then and thereupon this agreement shall be suspended both as to services and compensation during the period of such disability or incapacity, and the term of this agreement and all of its provisions herein contained shall be extended, at our option, for a period equivalent to the period of such suspension. In the event of the continuance of such disability or incapacity for a period or aggregate of periods in excess of three (3) days during the term hereof, we may, at our option, cancel and terminate your employment hereunder. In the event of such termination you shall not be entitled to any further compensation whatsoever, but may retain such compensation, if any, as may have been paid to you prior to such termination.

"6. In consideration of our execution of this agreement and of our consent to the amount of compensation as herein set forth, you hereby grant, license and empower us, and as well our successors and assigns, to manufacture and/or use throughout the world any and all devices and machines embodying and containing the inventions disclosed in said test machine which you have heretofore constructed for us, and/or embodying and containing any and all inventions developed and/or conceived by you during the term of your employment hereunder, and any and all improvements that may hereafter be conceived and developed by you in said machine, and in any and all other machines constructed and/or developed

Appellant contends that the agreement not to use the machines other than for its own use only prohibited the rental of the machines to other parties for use by them. It contends that the right to use the machine for its own use included the right to use the machine to process films for other companies for hire. The appellee on the other hand contends that the limitation clause is an agreement by appellant not to use the machines except to process films of its own production and that the contract did not license appellant to process films produced by other companies.

Testimony was offered and received to aid in the interpretation of the phrase "other than for our own use". The position of the parties and the rulings of the trial court with relation to the admissibility of evidence concerning what was said during the negotiations leading up to the contract are not altogether consistent. Much of the evidence deals with undisputed facts but upon some points the evidence is sharply conflicting. The witnesses all appeared before the court and under these circumstances the decision of the trial court upon the credibility of witnesses is presumptively correct and should not be disturbed unless manifestly erroneous. United States v. Mammoth Oil Co., 8 Cir., 14 F.2d 705, 717; United States v. Sands, 10 Cir., 94 F.2d 156, 161; Aro Equipment v. Herring-Wissler Co., 8 Cir., 84 F.2d 619; Nygard v. Dickinson, 9 Cir., 97 F.2d 53, 58; Easton v. Brant, 9 Cir., 19 F.2d 857.

The trial court found that while the appellant was doing "outside work" in violation of its contract of November 9, 1928, its officers denied that it was doing such work, and stated to appellee, "you know we are restricted from doing outside work according to your contract".[3]

According to the evidence this statement

---

by you hereunder, to the full end of the term for which any and all Letters Patent may be granted thereon. It is expressly understood and agreed that any inventions developed by you while in our employ shall be and remain your sole property, and the license to manufacture and/or use the same, as herein specified, shall not entitle us, our successors or assigns, to manufacture and/or use such devices and machines other than for our own use.

"7. We shall not be obligated to pay you any compensation during any period that you shall fail, refuse or neglect to fully and faithfully perform your required services hereunder, and we may, at our option, extend the term of your employment hereunder . for a period equivalent to the time during which such failure, refusal or neglect shall have continued; or, in the event of such failure, refusal or neglect, we may forthwith terminate your employment hereunder. Each and all of the several rights, remedies and options contained in this agreement shall be construed as cumulative and no one as exclusive of the others or of any right or remedy allowed by law.

"8. All dies, patents, molds and other material furnished by us shall be and remain our property for all purposes whatsoever.

"9. All notices which we are required or may desire to give you under or in connection with this agreement may be given by addressing the same to you at our studio at Culver City, California, and by depositing the same so addressed, postage prepaid, in the United States mail at Culver City or Los Angeles, California, or, at our option, we may deliver such notice as we are required or may desire to give you, to you personally, either orally or in writing.

"If the foregoing is in accordance with your understanding of our agreement, kindly indicate your approval and acceptance thereof in the space hereinbelow provided.

"Very truly yours,
"Metro-Goldwyn-Mayer Corporation
"By [Sgd.] Louis B. Mayer,
"Vice-President
"Approved and Accepted:
"[Sgd.] Ralph G. Fear"

[3] Finding "XXVI. That it is true, as testified to by defendant, Fear, that when, having become suspicious as to whether or not plaintiff was doing outside work, that is, processing film other than of their own productions, said defendant sought an interview with the representatives of plaintiff and informed such representatives that he (defendant) had heard that plaintiff was doing outside work and that he (defendant) came to check to find out if it were true or not; that one of said representatives answered, 'That is absolutely not true' and it was further admitted on behalf of plaintiff 'You know we are restricted from doing outside work according to your contract.' "

Finding "XXVII. That notwithstanding the denials on behalf of plaintiff set forth in the immediately preceding Finding, plaintiff at and before the time of said representations had been and was doing outside work in violation of its said contract of November 9, 1928."

was made sometime after April 10, 1935. These statements were attributed by the appellee to John M. Nickolaus who was in charge .of appellant's laboratory and had participated in negotiations leading up to the contract of November 9, 1928, and to Edgar J. Mannix, appellant's vice-president and general manager.

Ray C. Wilcox, an employee of the appellee, corroborated the appellant only in the statement that Mr. Nickolaus denied that the appellant was doing any outside work.[4] But he fully corroborated appellee in the statement that Mr. Mannix stated that the contract in question "prohibited them from doing any films other than their own films". Mr. Nickolaus and Mr. Mannix each denied making such statements.

Appellant contends that in addition to such denials there are circumstances tending to show that the statements attributed to these two witnesses were never made; but there is nothing in the case which points so strongly to the conclusion that the appellee, or his witness Wilcox, were not worthy of credit as to justify our reversing the decision of the trial court on the question of their credibility. The appellee also testified that in October 1928, leading up to the contract in question, Mr. Nickolaus stated "that he expected to put these machines into the laboratory for developing the film that Metro-Goldwyn-Mayer produced on their own lot. * * * He said he wanted these machines for their own use, to develop sound track for the negatives, and to produce their dailies. He said he wanted those machines so he would be independent of sending his film to commercial laboratories. * * * He said that the quality of the work that he was getting by having to send his films to commercial laboratories was very bad, and for that reason it was necessary for them to have developing machines in their own laboratory so that they could do their own work. He said Metro-Goldwyn-Mayer would not pay a royalty on any developing machine."

There is also some uncertainty in the evidence as to which one of the parties is responsible for the use of the ambiguous phrase under consideration. The trial court found specifically that the contract was drawn by the plaintiff.[5]

As opposed to this evidence, in addition to its directly contradictory testimony, the appellant points out that it is entirely unreasonable to believe that it made the statements attributed to it or agreed to so limit the use of the developing machines constructed under the contract. It is pointed out that the average production of. film for processing by the appellant was about 2,000,000 feet each week, or 104,000,000 feet per annum, but owing to the necessity for getting out releases promptly it was necessary to have a plant capable of turning out 4,000,000 feet weekly; that it was economically desirable, if not absolutely necessary, that the laboratory costing nearly half a million dollars with its 300 employees should be occupied the entire time; that in pursuance of this plan it had processed about a million lineal feet per week "outside work" in addition to the footage exposed on the premises of the appellant. It is also pointed out that the contract of November 9th provided that the appellee should devote his time to other inventions than the developing machine if during the four months period of his employment he had the opportunity so to do. It is quite true, as appellant points out, that the interpretation placed by the trial court upon the words "for our own use" would not be apt as applied to some device other than a machine or implement to process film. While such a consideration is to be weighed in connection with all the other considerations in determining the meaning of the contract, it is quite clear from the terms of the contract that its main purpose was to provide for the perfection of the development ma-

---

4 "A. We mentioned to Mr. Nickolaus that we came to inquire whether. they were doing outside work; whether they were doing work in their laboratory outside of films which they made in their own production, and Mr. Nickolaus said — * * *

"A. (continued) Mr. Nicholaus said no, they were not, that even if they were able to do outside laboratory work that their standardization set-up in their laboratory was such that it would interfere seriously with that; that they had standardized photographic equipment; that they had standardized lenses; that they had standardized testing, so they wouldn't be in a position to do outside work even if they could."

5 Finding "XXIII. That said contract in question, namely, that dated November 9, 1928, is plainly not such as one businessman might write to another, but is drawn with extreme care by the plaintiff, and in the interest of plaintiff, and with an abundance of precautionary provisions."

chine. Therefore, little aid in the interpretation of the contract concerning use can be derived from the attempt to construe the contract upon the hypothesis that some other machine or gadget might have been invented during the four months of the appellee's employment. While there are some considerations which strongly support the testimony of appellant's employees, and there are some indications of unreliability of memory in the testimony of appellee, there is nothing in the record which justifies us in departing from the established rule that the judgment of the trial court upon the credibility of witnesses who have appeared before it is presumptively correct.

■ It is clear, however, that the conclusions of law and the decision of the trial court go entirely too far in holding that the appellant could not use the developing machines to develop exposed film purchased from other producers. No possible construction of the words "our own use" would justify the conclusion that the appellant was not entitled to use the machine in developing any film it owned regardless of the fact that the latent image thereon may have been placed there by operatives of another company.

■ Appellant contends that the court erred in holding that it had breached the contract. Insofar as this contention is predicated on the argument that the agreement was not a contract by appellant to limit its use but merely a license agreement, what we have heretofore said is sufficient answer to the claim. It is also claimed, however, that no such issue was presented by the pleadings in the case. In the complaint the execution of the contracts and the construction of the machines in accordance with the agreement of the parties was alleged and appellant also alleged that it had developed and printed film for hire for other motion picture producers. These allegations were admitted in the answer. The prayer of the bill of complaint was in part as follows: "That the rights and obligations of plaintiff and defendant in, to and under said agreement of November 9, 1928, and in the premises and under the facts and circumstances herein set forth and as found and adjudged by this Court be adjudged and decreed, pursuant to section 274d of the Judicial Code of the United States (Federal Declaratory Judgments Act, Title 28, Section 400, U.S.C.A.)."

We hold that the pleadings sufficiently presented the question of breach of contract.

Appellant's next contention is that the district court erred in not granting an injunction and ordering an accounting for damages because of the sending of letters by appellee to appellant's customers threatening to sue them for infringement. Appellant's theory is that its suit is based upon two causes of action, one for unfair competition or trade libel based upon the sending of the threatening notices to appellant's customers, and, the other for declaratory relief under section 274d of the Judicial Code, (28 U.S.C.A. § 400) to determine the rights of the parties under the agreement above referred to. To sustain its cause of action for unfair competition and, consequently, its right to an injunction and damages, appellant relies upon the admissions in appellee's answer.

■ The sending of the letters to appellant's customers is admitted in the answer. It is clear that the sending of these letters by appellee was improper and that appellee was not entitled to take such action in order to protect its rights under its patent, No. 1,891,225. The patent was introduced in evidence and covers a machine designed to be used for the processing of exposed film. It does not cover nor claim the developed film as invention. The sale or use of the products of the machine (the film) by the customers of appellant would not constitute an infringement of the machine patent. Keplinger v. De Young, 10 Wheat. 358, 6 L.Ed. 341; Merrill v. Yeomans, 94 U.S. 568, 24 L.Ed. 235; Salvage Process Co. v. James Shewan & Sons, Inc., D.C., 26 F.2d 258; Goodyear v. Central R. Co. of N.J., 10 Fed.Cas.No. 5,563, page 664; Welsbach Light Co. v. Union Incandescent Light Co., 2 Cir., 101 F. 131; Barton v. Nevada Consol. Copper Co., D.C., 36 F.2d 85; In re Amtorg Trading Corp., Cust. and Pat.App., 75 F.2d 826. This was conceded in the court below. Consequently, appellee had no legal justification for sending such notices or threats to appellant's customers even though it be assumed that he was correct in his contention that appellant was going beyond the scope of this license and infringing the patent by its use of the machines. American Ball Co. v. Federal Cartridge Corp., 8 Cir., 70 F.2d 579. It is clear, then, that the conduct of appellee was without legal right. It is also clear that there was a reasonable probability that damage would result from such conduct. Under such circumstances, the appellant was entitled to an injunction. American Ball Co. v. Federal Cartridge Co.,

supra. The fact that appellee discontinued sending the letters and consented to a temporary injunction at the trial was not sufficient ground for refusing the injunction. See Clark Thread Co. v. William Clark Co. 55 N.J.Eq. 658, 37 A. 599; Id., 56 N.J.Eq. 789, 40 A. 686; Pacific Mut. Tel. Co. v. Chicago, etc., Bridge Co., 36 Kan. 118, 12 P. 560. Compare, William H. Keller, Inc., v. Chicago Pneumatic Tool Co., 7 Cir., 298 F. 52.

There is no merit, however, in appellant's contention that the lower court erred in failing to render a judgment for damages. Without deciding the question of whether or not a sufficient case for damages was made out, it is sufficient to say that the parties at the trial of the cause stipulated that the question of whether appellant was to get any damages and, if so, the amount, was to stand over for further hearing.

Decree ordered modified in accordance with this opinion and, as modified, affirmed.