**MIDLAND STEEL PRODUCTS CO. v. CLARK EQUIPMENT CO.**
Civil Action No. 413.

District Court, W. D. Michigan, S. D.
Dec. 30, 1947.

See also 7 F.R.D. 132.

Richey & Watts, F. O. Richey, and Leslie Nichols, all of Cleveland, Ohio, and Laurence W. Smith, of Grand Rapids, Mich., for plaintiff.

John A. Dienner and Edward C. Grelle, both of Chicago, Ill., Walter E. Schirmer, of Buchanan, Mich., and Frank E. Liver-

ance, Jr., of Grand Rapids, Mich., for defendant.

STARR, District Judge.

This is a suit under the patent laws of the United States. Plaintiff is an Ohio Corporation, and defendant is a Michigan corporation with an established place of business in the city of Buchanan within this judicial district.

Plaintiff is the assignee and owner of the following patents and charges infringement thereof by defendant: Riemenschneider No. 1,810,112, issued June 16, 1931, for a "Process for Welding Metal Tubing"; Riemenschneider No. 1,948,801, issued February 27, 1934, for "Method and Apparatus for Welding"; Riemenschneider No. 2,061,671, issued November 24, 1936, for "Apparatus for Welding"; and Riemenschneider No. 2,139,771, issued December 13, 1938, for "Method and Apparatus for Welding." These patents all relate to apparatus and methods for the welding of metal tubing.

Patent No. 1,810,112 describes the method and apparatus whereby flat, elongated strip metal stock is passed through rolls which form it into tubular shape with the edges of the stock brought close together to form an open seam cleft; passing this open seam cleft through an elongated heating zone, thereby melting the edges of the stock to their full depth; maintaining the molten metal of the edges as a narrow pool of molten metal in the open seam cleft; supporting the under side of the molten metal to hold it in the seam cleft; moving the edges of the stock closer together, thereby reducing the width of the seam cleft; cooling the molten metal in the cleft to create a fusion-welded tube with practical homogeneity between the weld and the adjacent metal of the tube.

Patent No. 1,948,801 describes the method and apparatus for the welding of the spaced-apart edges of metal tube stock through the use of a series of pairs of electrodes spaced apart above the open seam cleft; the projection of a stream of low-velocity hydrogen gas across the arcing terminals of the electrodes directly into the open seam cleft so that the heat is projected into the cleft to the full depth of the spaced-apart edges; the creation of molten metal on the edges to their full depth; the moving of the edges closer together so that the liquid metal runs together and forms a pool in the seam cleft, thereby bridging the cleft and creating a fusion weld.

Patent No. 2,061,671 describes the method and apparatus for welding the spaced-apart edges of metal tube stock through the use of a welding head having a series of pairs of electrodes, each pair being arranged in convergent positions relative to a line of convergence, with their arcing terminals laterally displaced with respect to each other in the direction of the line of convergence; the projection of hydrogen gas through the arc between each pair of electrodes; the arrangement of the pairs of electrodes so closely together that the individual zones of hydrogen gas merge into one another to establish a substantially-continuous, elongated welding zone extending lengthwise of the tube seam cleft to be welded.

Patent No. 2,139,771 describes the method and apparatus for welding the spaced-apart edges of metal tube stock as provided in the above-mentioned prior Riemenschneider patents, and in addition thereto provides for a mandrel within the tubing over which the tubing is moved, and a shoe supported by the mandrel, with an elongated, substantially-flat surface for supporting the molten metal within the seam cleft, and with means for cooling the under surface of the molten metal in the cleft.

About 1936 General Electric developed and sold to defendant a welding head for use in connection with the atomic-hydrogen welding of thick-walled metal tubing. This head was embodied in a welding machine which was placed in operation by defendant about 1938. Thereafter plaintiff claimed that this welding head and the methods and apparatus employed by defendant in its use, infringed the patents in suit. In settlement of this controversy plaintiff and General Electric entered into a licensing agreement on February 15, 1939, which recited among other things that plaintiff owned the patents in suit and claimed that they were infringed by

defendant's use of the apparatus for atomic-hydrogen welding which embodied the welding head it had purchased from General Electric. It further recited that General Electric owned Palmer patent No. 1,916,014; Weller patent No. 1,946,302; Catlett patent No. 1,946,305; Langmuir patent No. 1,947,267, and claimed that they were infringed by plaintiff. It also recited that the parties desired to settle said claims of patent infringement. In this agreement plaintiff granted General Electric a fully-paid, nonexclusive license to make, use, and sell apparatus for welding, embodying the inventions claimed in patent in suit No. 2,061,671, excluding and excepting claim 10 thereof, for the full term of said patent and any reissue or extensions thereof. Plaintiff released and discharged General Electric from all claims for infringement of patent No. 2,061,671 except as to claim 10 thereof, arising prior to the date of the agreement. Plaintiff also released and discharged all prior purchasers of welding apparatus from General Electric which embodied the inventions claimed in said patent in suit No. 2,061,671, except claim 10, from all claims for infringement arising out of the manufacture, use or sale of such apparatus. It should be noted that the agreement further provided that the above-mentioned license, release, and discharge, with reference to plaintiff's patent No. 2,061,671 should not be construed to extend to or embrace methods of welding claimed in any other patents then or thereafter owned or controlled by plaintiff. The agreement also provided in part as follows:

"5. Midland (Steel Products Company, plaintiff) does hereby grant to said Clark Equipment Company (defendant), a non-exclusive, royalty-free license under said Letters Patent Nos. 1,810,112; 1,948,801; 2,061,671 and 2,139,771 to use the one apparatus (first machine) for atomic hydrogen welding heretofore purchased from General to the full end of the terms of said Letters Patent, or any reissue or reissues, or extension or extensions thereof. * * * Midland releases and discharges said Clark Equipment Company from any and all claims for infringement of said Letters Patent Nos. 1,810,112; 1,948,801; 2,061,671 and 2,139,771 arising prior to the date hereof.

"6. General hereby grants to Midland a non-exclusive, fully paid, royalty-free license under the said Letters Patent Nos. 1,916,014; 1,946,302; 1,946,305; 1,947,267, and all other General patents or applications existing at the date of this agreement and relating to atomic hydrogen welding, * * * to the full end of the terms of said Letters Patent. * * * General hereby releases and discharges Midland from any and all claims for infringement of the aforesaid Letters Patent arising prior to the date hereof.

"7. To those purchasers of apparatus for atomic hydrogen welding manufactured and sold by General, upon request of such purchasers, Midland agrees to grant non-exclusive, non-assignable licenses under claim 10 of said Letters Patent No. 2,061,671 and under said Letters Patent Nos. 1,810,112; 1,948,801; and 2,139,771 and any reissue or reissues, or extension or extensions thereof, on a royalty basis not greater than the following, based on the cost of stock used in manufacturing under said Letters Patent:

"17 gauge and lighter—a royalty of 6% of delivered stock cost.

"11 to 7 gauge inclusive—a royalty of 4% of delivered stock cost.

"6 gauge and heavier—a royalty of 3% of delivered stock cost."

This agreement also provided that upon its execution General Electric would pay plaintiff $10,000. This sum was paid by General Electric.

About 1941 defendant purchased another welding head from General Electric and embodied it as a component part of a second welding machine. In the testimony and in this opinion the welding machine which defendant installed in 1938 is referred to as the "first machine," and the welding machine which it installed about 1941 is referred to as the "second or accused machine." The heavy-walled tube stock welded on each of defendant's two machines was formed into axle housings for motor trucks. Plaintiff had constructed a welding machine or machines under its patents in suit and used the same in the

welding of lighter-walled tube stock, which was formed into axle housings for passenger cars. The housings produced by defendant for use in trucks and the housings produced by plaintiff for use in passenger cars both apparently met with commercial success. An official of defendant company testified: "We have made approximately 5½ million truck axle housings since 1936, and of that maybe 20 to 25 per cent have been made by this second so-called seaming apparatus (accused machine) and approximately 15 to 20 per cent made by the first machine and the balance made out of seamless tubing."

Later, after conferences with defendant's representatives and with experts in the welding field, plaintiff notified defendant that its second or accused machine was infringing the patents in suit. Defendant denied infringement. On May 10, 1944, plaintiff filed complaint, alleging infringement of the method and apparatus claims of the patents in suit. It asked for an injunction against further infringement, an accounting of defendant's profits, payment of plaintiff's damages occasioned by the alleged infringement, and for assessment of costs. However, during the trial plaintiff limited its charge of infringement to claims 1, 2, and 3 of patent No. 1,810,112; claims 3, 5, 7, and 8 of patent No. 1,948,801; claims 26 and 30 of patent No. 2,061,671; and claims 1, 4, 7, 8, 16, and 18 of patent No. 2,139,771. Defendant answered, denying infringement and alleging that by the agreement of February 15, 1939, plaintiff had granted it a license under the patents in suit to use the first machine for atomic-hydrogen welding for the full terms of the patents; that plaintiff had released it from all claims for infringement of said patents; and that its second or accused machine was free and beyond the scope of patent in suit No. 2,-061,671 and of the apparatus claims of patents in suit Nos. 1,948,801 and 2,139,771, because it had purchased the welding head or unit embodied in this machine from General Electric subsequent to the 1939 agreement which gave General Electric a fully-paid, nonexclusive license to make, use and sell apparatus embodying the inventions claimed in said patent No. 2,061,671 except claim 10 thereof. Defendant also alleged that General Electric had an implied license under the apparatus claims of patents Nos. 1,948,801 and 2,139,771 to make, use, and sell the apparatus disclosed in patent in suit No. 2,061,671 except claim 10 thereof. In its answer defendant alleged that its second or accused machine was constructed in accordance with the disclosure and claims of Catlett patent No. 2,282,031 issued May 5, 1924, for "Welding Apparatus"; and that its welding operations with this machine were performed in accordance with the teachings and claims of Catlett patent No. 2,282,032 issued May 5, 1942, for a "Method of Seam Welding." (General Electric is the assignee and owner of these two Catlett patents.) Defendant further alleged that its accused machine and its operation thereof did not come within the scope of any of the specified claims of the patents in suit; that the method and apparatus claims of the patents in suit were invalid because, prior to the date of the alleged inventions by Riemenschneider and more than two years prior to the filing dates of the applications for said patents, the inventions claimed therein had been "described, published, patented and contained in Letters Patent and printed publications." In its answer defendant further alleged (1) that certain method and apparatus claims of the patents in suit were invalid because anticipated in the prior art; (2) that these claims did not represent invention but only the skill of one versed in the art; (3) that certain claims were a mere aggregation of steps and not a patentable process; (4) that certain claims were a mere aggregation of elements and not a patentable combination; (5) that certain claims were functional and not patentable; (6) that certain claims were vague and indefinite and failed to comply with the statutory requirements; (7) that certain of the patents in suit were invalid because of double patenting; and (8) that certain of the patents were invalid because of lack of novelty and utility. Defendant alleged that under the decision of the Court of Customs and Patent Appeals in the case of In re Riemenschneider, 1933, 65 F.2d 464, 20 C.C.P.A., Patents, 1183, plaintiff was estopped from seeking or obtaining sufficiently broad construction of the claims of patents in suit Nos. 1,810,112,

1,948,801, and 2,139,771 to cover any apparatus made or used or any methods practiced by defendant. In support of its claims of invalidity defendant cited more than 140 prior-art patents, but during the trial it selected the following 16 as most pertinent to the patents in suit: Lloyd, No. 1,027,865; Snodgrass, No. 1,085,639; Lloyd, No. 1,124,760; Lloyd, No. 1,141,068; Amberg, No. 1,373,043; Berg et al., No. 1,481,887; Fay, No. 1,706,393; Berg, No. 1,716,847; Anderson, No. 1,877,621; Morris, No. 1,879,409; Anderson, No. 1,930,847; Anderson, No. 1,960,523; Howard (British), No. 5641; Hand, No. 1,707,433; Hand, No. 1,739,757; Hand, No. 1,774,000. In further support of its claims of invalidity defendant cited the following publications: General Electric Review, Vol. 29, No. 3, March 1926, pages 153-159, article entitled "Flames of Atomic Hydrogen" by Dr. Irving Langmuir; General Electric Review, Vol. 29, No. 3, March 1926, pages 160-168, article entitled "Atomic Hydrogen Arc Welding" by R. A. Weinman and Irving Langmuir; Industrial and Engineering Chemistry, Vol. 19, No. 6, June 1927, pages 667 et seq., article entitled "Flames of Atomic Hydrogen" by Irving Langmuir. However, in view of the court's holding hereinafter set forth that defendant is estopped to deny the validity of the patents in suit, it is unnecessary to consider or discuss in detail its above claims of patent invalidity.

## Discussion.

It appears that General Electric had guaranteed the welding heads or units sold to defendant against patent infringement claims. By reason of this guarantee and the provisions of the license agreement of February 15, 1939, General Electric became directly involved in the issues here in controversy and actively cooperated with defendant in the trial of the case.

It should be kept in mind that the license agreement of February 15, 1939, is still in full force and effect. Plaintiff first contends that defendant is estopped from denying the validity of the patents in suit because of the provisions of said agreement. Paragraph 5 of that agreement, hereinbefore quoted, granted defendant a nonexclusive, royalty-free license under the patents in suit "to use the one apparatus" (first machine) for the full term of the patents. Plaintiff released and discharged defendant from all claims for infringement of the patents in suit arising prior to the date of the agreement. Considering the agreement as a whole, it is clear that plaintiff's grant to defendant of a nonexclusive, royalty-free license under the patents in suit, was limited and restricted to "the *one* apparatus" (first machine), which is still in operation and about which there is no dispute in the present case.

Paragraph 7 of the agreement, hereinbefore quoted, provided in effect that upon their request, plaintiff would grant to defendant and other purchasers of atomic-hydrogen welding apparatus from General Electric, nonexclusive, nonassignable licenses under patents in suit Nos. 1,810,112, 1,948,801, 2,139,771, and under claim 10 of patent in suit No. 2,061,671, upon a specified-royalty basis. The second or accused machine installed by defendant about 1941, which embodied the atomic-hydrogen welding head which it had purchased from General Electric, clearly came within the terms and intent of this paragraph, but defendant did not request or obtain a license for this accused machine. In other words, defendant's first machine came within the license provisions of paragraph 5 of the agreement, and its second or accused machine came within the license provisions of paragraph 7. The agreement of February 15, 1939, granted General Electric a license to make, use, and sell apparatus for welding embodying the inventions claimed in patent No. 2,061,671, excepting claim 10 thereof. Defendant claims that because it purchased the welding head embodied in its accused machine from General Electric after February 15, 1939, it had an implied license under said agreement. However, this license agreement expressly provided in paragraph 3 that the license and release relating to patent No. 2,061,671 granted General Electric by plaintiff should "not be construed to extend to or embrace methods of welding claimed in any other patents" owned by plaintiff. In view of paragraph 3 and the provisions of paragraph 7 relating to plaintiff's issuing an additional license upon a royalty basis, it is clear that defendant did

not have an implied license under the patents in suit. Defendant contends that because it did not expressly agree not to contest the validity of the patents in suit, it is not estopped to question the validity of these patents. However, paragraph 5 of the agreement granted defendant a license restricted and limited to its first machine, and paragraph 7 provided in effect for granting a license for additional machines on a specified-royalty basis. These provisions of the agreement, when construed together, clearly created an implied covenant by defendant not to make or use atomic-hydrogen welding machines, other than its first machine, without obtaining from plaintiff a license on a royalty basis under paragraph 7. Ellis, Patent Assignments and Licenses, page 728. In view of this implied covenant and defendant's reliance upon the provisions of the license agreement, and because it claims an express license under the patents in suit as to its first machine and an implied license as to its accused machine, the court concludes that it is estopped to deny the validity of the patents in suit. In Sbicca-Del Mac, Inc., v. Milius Shoe Co., 8 Cir., 145 F.2d 389, 400, the court said:

"The defendant as licensee is estopped not only to deny the validity of the patents, Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; Limbershaft Sales Corp. v. A. G. Spalding & Bros., 2 Cir., 111 F.2d 675, 677, but also to deny that Sbicca and Maccarone had invented anything new. Eclipse Bicycle Co. v. Farrow, supra [199 U. S. 581, 26 S.Ct. 150, 50 L.Ed. 317]."

In Sinko Tool & Mfg. Co. v. Casco Products Corporation, 7 Cir., 89 F.2d 916, plaintiff Casco sued for infringement of its patents for a cigar lighter for automobiles. In the license agreement between these parties the plaintiff reserved the right to make lighters under the patents in suit to be sold as "standard equipment" on automobiles and granted defendant Sinko a license to make lighters to be sold as "attachments, replacements, or accessories" for automobiles. Plaintiff relied upon the license agreement and claimed that defendant was estopped to deny the validity of the patents both as to the standard-equipment and ac-

cessory fields. In holding that defendant was estopped as to both fields, the court said, 89 F.2d at page 918:

"Inasmuch as the purpose was to grant all of the inventions to appellant for the accessory trade and to restrain it from entering the standard equipment trade with the same mechanism, it must have been the intent of the covenant to bind appellant to estoppel equally as to both sorts of equipment.

"Ordinary equitable principles require that the acceptor of such a license with such a limitation must understand that he is not to enjoy the rights reserved by the limitation and that the estoppels proper to be urged against him as a licensee of the inventions apply not only to such devices as are sold in the licensed field but also to those sold in the limited field, where, as here, the mechanism of each is the same. It is just as though appellant had covenanted not to sell to chain stores.

"Under the facts of this case, we conclude that there is no limitation upon the estoppel against the licensee; that, inasmuch as appellant is a licensee for all the inventions for a particular trade, he is not in position to attack the validity of the patents, either when he sells to that trade or when he breaks his agreement and sells the same mechanism to the prohibited trade. In neither instance is the question of validity open to him.

"Nor do the cases cited by appellant, when properly analyzed, militate against this conclusion. In Tate v. Baltimore & O. R. Co., 4 Cir., 229 F. 141, 142, the license was at an end. Consequently the estoppel was at an end. The court there said: 'The rule is that a licensee is estopped to deny the validity of the patent as long as he is acting under it; but when the license is at an end, whether by reason of expiration of time or the completion of the number of patented articles for which it provided, there is no longer any contract relation, and there is no ground of estoppel.' "

In Metro-Goldwyn-Mayer Corporation v. Fear, 9 Cir., 104 F.2d 892, 896, the court said:

"We conclude, however, that the words limiting the right to use was a promise or

covenant by the appellant to confine its use of the machines to its 'own use'. If the words were not of themselves a covenant by appellant one would be implied. See, Cassidy v. Evan L. Reed Mfg. Co., D.C., 293 F. 797."

■ In the case of Eskimo Pie Corporation v. Arctic Fruit Ices, Inc., D.C., 15 F.2d 853, the court stated: "The license agreement has not been canceled, and defendant is estopped to deny the validity of the patent." In Tate v. Baltimore & O. R. Co., 4 Cir., 229 F. 141, 142, the court said: "The rule is that a licensee is estopped to deny the validity of the patent as long as he is acting under it." See, also, Ellis, Patent Assignments and Licenses, page 728; Cassidy v. Evan L. Reed Mfg. Co., D.C., 293 F. 797; 2 Walker on Patents, Deller's Edition, pp. 1492-1494, sec. 383, and authorities there cited.

■■ However, the above holding that defendant is estopped to deny the validity of the patents in suit does not bar it from questioning the scope of the patents in connection with its defense of noninfringement. Plaintiff does not claim infringement by defendant's first machine. It only claims that defendant's second or accused machine infringes the several specified claims of the patents in suit. The question of infringement is one of fact, United States Rubber Co. v. General Tire & Rubber Co., 6 Cir., 128 F.2d 104, 108; Aluminum Co. of America v. Thompson Products, Inc., 6 Cir., 122 F.2d 796; Fuller v. Yentzer, 94 U.S. 299, 24 L.Ed. 107, and the burden is upon plaintiff to establish its claim of infringement by a preponderance of the evidence. The court must compare the method and apparatus claims of the patents in suit which plaintiff contends were infringed, with the apparatus, method, means, and mode of operation of defendant's accused machine, to determine whether or not there is infringement. 3 Walker on Patents, Deller's Edition, p. 1681, sec. 450.

Defendant denies the charge of infringement and contends that its accused machine was constructed and operated in accordance with the disclosures and claims of Catlett patents Nos. 2,282,031 and 2,282,032 and that it does not come within the scope of any of the specified claims of the patents in suit. These two Catlett patents, when considered together, disclose and describe apparatus and method for the welding of thick-walled metal tube stock by beveling the edges of the stock so as to form a V-shaped groove in the upper portion of the seam and by bringing the lower edges of the stock into contact, thereby forming a Y-shaped seam cleft; the projection of heat into the V-shaped groove, thereby creating a pool of molten metal in the groove and raising the abutting edges or stem of the Y-shaped seam to a forge-welding temperature. Claims 1 and 3 of Catlett patent No. 2,282,032 state:

"1. The method of seam welding which comprises progressively applying heat along a Y seam as rapidly as possible until the leading end of an elongated pool of molten metal begins to form in the seam, then at a less rapid rate to transmit heat through said pool of molten metal until the non-molten edges of said seam below said pool have been raised to a forge welding temperature, and finally at a still less rapid rate which permits the trailing end of said pool to solidify from its bottom upwardly and while thus applying heat applying a side pressure to said seam which progressively brings opposed surfaces at its bottom into engagement with one another before the formation of said pool, then completes a forge weld between said bottom surfaces with sufficient deformation of the seam edges to fill the top portion of said seam with said molten metal and finally holds said seam securely during the time necessary for the welded portions to become strong enough to withstand the stresses resulting from the welding operation."

"3. The method of seam welding which comprises preparing a seam between plates by beveling the edges of said plates to form a V-groove with an included angle of between 80 degrees and 90 degrees and abutting lip edges of sufficient thickness to retain molten metal in said V-groove while said lip edges are being raised to a forging temperature by heat transmitted through said molten metal, progressively applying heat to said seam as rapidly as possible until the leading end of an elongated pool of

molten metal begins to form in said V-groove, then at a less rapid rate so that said pool of molten metal is not raised substantially above its boiling temperature while the abutting lip edges below said pool have been raised to a forge welding temperature, and finally at a still less rapid rate which permits the molten metal in the trailing end of said pool to solidify from the bottom upwardly, and applying a side pressure to the seam which progressively brings the abutting lip edges at the bottom of said seam into engagement with one another before the formation of said molten pool, then completes a forge weld between said abutting lip edges while upsetting the seam edges sufficiently to fill said V-groove with said molten metal and finally holds the plate edges securely until the weld thus produced becomes strong enough to withstand the stresses resulting from the welding operation."

Under plaintiff's patents in suit the spaced-apart edges of the tube seam cleft are melted to their full depth, thereby creating an elongated, narrow pool of molten metal, so that when the edges are brought closer together through the use of pressure rolls, a fusion weld to the full depth of the edges is formed. Defendant claims that its apparatus and method produce a forge or pressure weld in the lower part or Y-stem of the seam and a fusion weld in the upper part or V-groove of the seam. Plaintiff denies that defendant's apparatus and method produce a composite forge-and-fusion weld, and it claims that defendant's weld is, in reality, a complete fusion weld and thereby infringes the patents in suit. In its brief defendant states its version of the differences between the operation and results of its accused machine and the operation and results of a machine under plaintiff's patents in suit, as follows:

"Plaintiff employs continuous strip of low carbon steel not over 3/16" wall thickness, 368 feet long.

"Defendant uses plates of fairly high carbon steel (.350) .330" wall thickness, 5½ feet long.

"Plaintiff uses rough untreated edges substantially radial of the tube. Defendant trims the edges and bevels off the outer corner about one third of the lower part of the edge being square with the body of the plate to form a Y-cleft.

"Plaintiff feeds the long strip stock in a continuous pass through the forming rolls, around a spacer, with an open seam cleft under the welding head, and thence to the pushup rolls.

"Defendant edge trims, chamfers and forms the short plates in a separate machine having no necessary relation to the welder. The formed tubes * * * are fed into a set of four pairs of side pressure rolls with holding shoes between them, and with a welding head over the side pressure rolls extending from a point between the first and second pairs of side pressure rolls to a point between the third and fourth pairs of side pressure rolls.

"Plaintiff feeds the continuous tube stock with the edges spaced apart from the spacer in front of the welding head to the pair of pushup rolls at the rear of the welding head, and with no support of the tube between the spacer and the pushup rolls. Defendant feeds short tube lengths into the four pairs of side pressure rolls under the welding head with the edges pressed against each other while under the welding head, and held by the holding shoes between the adjacent pairs of rolls.

"Plaintiff melts the spaced edges of the open seam cleft while said edges are traveling from the spacer to the pushup rolls.

"Defendant heats the closed bottom of the Y-cleft to soften the same for the forge weld.

"Plaintiff has a molten pool confined between the spaced edges and supported by the welding shoe.

"Defendant melts some of the metal at the top of the joint, but the major part below is unmelted and forms a solid phase weld.

"Plaintiff puts all the heat into the edges that they receive before the pushup rolls push the edges together.

"Defendant pushes up at the same time that heat is applied, so that pushup and heating is simultaneous.

"Plaintiff depends upon the long pool and the pushup to allow hydrogen to escape.

"Defendant provides the tenth arc well behind the other arcs to keep the surface molten to allow gas to escape.

"Plaintiff makes a fusion weld exhibiting a layer of solidified molten metal between the joined edges.

"Defendant makes a composite weld which consists of a solid phase or forge weld for the lower half or two-thirds and a fusion weld for the upper half or third."

Plaintiff's witness Helmuth testified in substance that short lengths of tube stock as welded on defendant's accused machine could not be welded to their full length under the method and process described in plaintiff's patents in suit because, under such method and process, there would be a wastage of several inches of unwelded stock at each end of the tube. The file history of the application for plaintiff's patent No. 1,810,112 indicates that certain claims were not allowed until they had been amended so as to provide for an open seam cleft and the melting of the edges of the stock to their full depth. In Schriber-Schroth Co. v. Cleveland Trust Co., 311 U. S. 211, 220, 61 S.Ct. 235, 239, 85 L.Ed. 132, the court said:

"It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent."

See, also, Exhibit Supply Co. v. Ace Patents Corporation, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736; Smith, Administratrix, v. Magic City Kennel Club, Incorporated, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707; Weber Electric Company v. E. H. Freeman Electric Company, 256 U.S. 668, 41 S.Ct. 600, 65 L.Ed. 1162.

As the patents in suit provided for melting the edges of the tube stock to their full depth, rough and irregular edges could be welded without prior treatment or preparation. However, under the methods described in the two Catlett patents and employed in defendant's accused machine, it was necessary to machine and prepare the edges of the tube stock before welding.

The testimony of expert witnesses adduced by each party as to the respective methods of welding and as to the structure and composition of the weld produced by defendant's accused machine and the weld produced under the patents in suit, is conflicting and in many instances confusing. It is admitted that the weld produced under the patents in suit was a fusion weld for the full depth of the edges of the tube. Plaintiff's experts examined the defendant's accused machine while in operation but admitted that while the tube was under the welding arcs, they could not tell whether the seam cleft was open or in contact, or whether the edges were molten for their full depth. A sample tube welded on defendant's accused machine in the ordinary course of production, was cut up, and sections of the weld were etched and macrographs and micrographs of the etched sections were put in evidence. Plaintiff's expert witnesses Kinkead and Helmuth testified in substance that the lighter or white-colored areas of defendant's weld as shown in the macrographs, indicated metal that was molten during the welding operation. However, this theory was apparently abandoned, as Kinkead later testified:

"The color does not have anything to do with it. * * * There is decarbonizing of the metal, a decarbonizing action of the atomic hydrogen. There is less carbon up here, that causes the lighter color. * * *

"The Court: Then the color here (shown in the macrograph) in your opinion is not affected necessarily by whether or not there was a molten state of the metal? A. No, sir, it is whether or not there is dendritic structure shown on the micrograph. * * *

"The white indicates the area of the weld, the location of the weld. * * *

"That in itself does not indicate molten metal."

Plaintiff sought to establish that the weld produced on defendant's accused machine was entirely a fusion weld resulting from the presence of molten metal for the full depth of the seam cleft in the tube. Its experts testified in considerable detail relative to the presence of columnar or dendritic structure in the weld as shown by the macrographs and micrographs of the etched sample of the weld. Defendant adduced testimony tending to show that the edges of the V-groove, or upper portion of the

seam cleft of the tube, were heated to a molten state and that the Y-stem, or lower portion of the seam, was heated to a forge-weld temperature, thereby creating a composite forge-and-fusion weld. It would serve no useful purpose to discuss in detail the voluminous technical testimony bearing on the questions as to whether or not the welding apparatus and method of defendant's accused machine created molten metal for the full depth of the seam cleft and whether its weld was entirely a fusion weld or a composite forge-and-fusion weld. Suffice it to say that plaintiff failed to establish by a preponderance of the evidence that defendant's accused machine created molten metal for the full depth of the seam cleft and that its weld was entirely a fusion weld.

Claims 1, 2, and 3 of patent in suit No. 1,810,112 hereinbefore described are not infringed by the apparatus and method of defendant's accused machine because defendant welds only short lengths (5½ feet) of tube stock and does not do a continuous process of welding long lengths of tube stock; because defendant does not employ an open seam cleft with the edges of the stock spaced apart for their full depth; and because it apparently does not create molten metal to the full depth of the seam cleft.

Claims 3 and 5 of patent No. 1,948,801 hereinbefore described are substantially the same as claims 1, 2, and 3 of patent No. 1,810,112, except that they provide for the projection of low-velocity hydrogen gas into the open seam cleft to melt the edges to their full depth. Claims 3 and 5 of patent No. 1,948,801 are not infringed by the apparatus and method of defendant's accused machine for the following reasons: Because defendant's accused machine does not weld continuous strip stock; because it does not project the atomic-hydrogen flame to the full depth of the seam cleft; because it does not melt the edges of the stock to their full depth; and because it presses the edges of the stock together while passing through the atomic-hydrogen flame rather than pressing them together after they have passed the heating zone, as provided in claims 3 and 5. Claims 7 and 8 of patent No. 1,948,801 are not infringed by the ap-

paratus and method of defendant's accused machine because the accused machine does not project the atomic-hydrogen flame to the full depth of the seam cleft and does not create molten metal to the full depth of the cleft and because it provides for pressing the opposing edges of the cleft together while they are passing through the heating zone rather than after they have left the zone.

Claims 26 and 30 of patent No. 2,061,671 hereinbefore described are not infringed by the apparatus and method of defendant's accused machine because of the difference in the location and spacing of the electrodes. Claim 26 of the patent in suit provides for a series of pairs of electrodes, each pair being arranged in convergent positions relative to a line of convergence, with their arcing terminals laterally displaced with respect to each other and arranged so closely together that the individual zones of atomic hydrogen merge into one another establishing a substantially continuous and elongated welding zone of atomic hydrogen. Claim 30 does not differ materially from claim 26. Plaintiff's expert witness Kinkead testified relative to claims 26 and 30 and also as to the different way in which the electrodes of defendant's accused machine are spaced, in part as follows:

"The purpose in the invention (No. 2,061,671) was to get the hydrogen arcs close together, to get an elongated molten pool, to melt down in between the edges of the seam. * * * So that a continuous hydrogen shield was maintained from one end of the group to the other during operation. * * *

"The Court: Then the change from the preceding patent (No. 1,948,801) is principally the placing of the hydrogen arcs closer together, so they will be producing a constant field of hydrogen, or shield over the molten metal? A. Yes, sir. * * *

"Q. What were these slight differences in structure you are referring to? A. Well, the different spacing of the electrodes.

"Q. How were the electrodes spaced in the defendant's head (accused machine)? A. Well, there were seven, and then a space, and then two, and then a space, and then one; whereas Riemenschneider (pat-

tent No. 2,061,671) puts them all in one line, all equally spaced."

Defendant's method of beveling and preparing the edges of the tube stock to be welded, and its spacing of the electrodes along the Y-seam, was intended to, and apparently did, result in the creation of a composite forge-and-fusion weld instead of a complete fusion weld as provided for in plaintiff's patent No. 2,061,671.

Claims 1, 4, 7, 8, 16, and 18 of patent No. 2,139,771 hereinbefore described are not infringed by the method and apparatus of defendant's accused machine, because defendant does not maintain an open seam cleft to the full depth of the opposing edges of the tube stock; because the accused machine does not reduce the edges of the seam to a molten condition for the full depth thereof; and because the arcs of the accused machine are spaced and arranged entirely differently from the spacing and arrangement specified in said patent No. 2,-139,771.

It might be argued that the welding results obtained under the method and apparatus claims of plaintiff's patents in suit, and the results obtained by defendant's second or accused machine were, for practical purposes, substantially the same. However, infringement cannot be grounded on mere similarity of result, because a result is not patentable. To constitute infringement there must, in addition to similarity of result, be substantial identity, or at least equivalence, of methods, means, and modes of operation. In Power v. Mola Washing Mach. Co., 8 Cir., 49 F.2d 1009, 1012, the court said:

"It is contended that the same result is reached by defendant's device as by the patent device; but this does not establish infringement. Not only the result reached must be the same, but it must be produced by substantially the same means, acting in substantially the same way. McDonough v. Johnson-Wentworth Co., 8 Cir., 30 F.2d 375, 383."

In Flowers v. Austin-Western Co., 7 Cir., 149 F.2d 955, 958, the court said:

"Except where form is of the essence of the invention, one device is an infringement of another if it performs substantially the same function in substantially the same way to obtain the same result. * * * *There must be real identity of means, operation, and result * * * and if one produces the same results in a different way he does not infringe."*

In Cimiotti Unhairing Company v. American Fur Refining Company, 198 U.S. 399, 410, 25 S.Ct. 697, 702, 49 L.Ed. 1100, the court said: "No one is an infringer of a combination claim unless he uses all the elements thereof."

The court concludes that defendant's second or accused machine does not infringe the specified method and apparatus claims of plaintiff's patents in suit. Plaintiff failed to establish its claims of infringement by defendant.

### Findings of Fact.

1. Plaintiff is an Ohio corporation with an established place of business in the city of Cleveland. Defendant is a Michigan corporation with an established place of business in the city of Buchanan within this judicial district.

2. Plaintiff is the assignee and owner of the four patents in suit.

3. Defendant's first machine and its second or accused machine were substantially similar in structure, method, and means of operation and results obtained.

4. The apparatus, method, means, and mode of operation employed by defendant's second or accused machine are substantially different from those described in the alleged infringed claims of the patents in suit. The apparatus, method, means, and mode of operation of defendant's accused machine are not equivalents of, nor are they merely colorable departures from those of the patents in suit.

5. The apparatus and method employed by defendant's accused machine are in substantial compliance with the claims and teachings of the Catlett patents Nos. 2,282,-031 and 2,282,032.

6. Defendant's second or accused machine and its method, means, and mode of operation do not infringe the specified claims of plaintiff's patents in suit.

### Conclusions of Law.

1. This court has jurisdiction of the parties and of the subject matter of this suit.

154

2. Defendant is estopped to deny the validity of the patents in suit.

3. The apparatus, method, means, and mode of operation of defendant's second or accused machine do not infringe the specified claims of plaintiff's patents in suit.

4. Plaintiff failed to establish infringement of the specified claims of its patents in suit by defendant.

5. Defendant is entitled to a decree dismissing plaintiff's complaint and amended complaint.

6. Defendant is entitled to recover costs.