## KENYON v. AUTOMATIC INSTRU-MENT CO.

### Civ. A. No. 509.

United States District Court
W. D. Michigan, S. D.
March 3, 1950.
Motion for Review Granted in Part
May 24, 1950.

Oltsch & Knoblock and Eugene C. Knoblock, Hammerschmidt & Johnson and Milton A. Johnson, all of South Bend, Indiana, and Bidwell, Schmidt & Martin and Seth R. Bidwell and Walter K. Schmidt, all of Grand Rapids, Michigan, for plaintiff.

Clarence J. Loftus, William E. Lucas, and Lowell F. Hammand, all of Chicago, Illinois, and Uhl, Bryant, Slawson & Wheeler and Marshall M. Uhl and James H. McLaughlin, all of Grand Rapids, Michigan, for defendant.

STARR, District Judge.

Plaintiff brings this action to recover from defendant, a Michigan corporation, royalties alleged to be due under the following contract between her deceased husband, Bertram C. Kenyon, and the Automatic Musical Instrument Company, a Delaware corporation:[1]

"This agreement made and entered into the 7th day of December, 1925, by and between Automatic Musical Instrument Company, a corporation organized, authorized and doing business under and by virtue of the laws of the State of Delaware as party of the first part and Bertram C. Kenyon of the city of Grand Rapids, Michigan, as party of the second part, witnesseth:

"*First,* Said first party hereby agrees to employ said second party for a period starting on the day hereof and extending to and including the 15th day of July, 1926, for the purpose of perfecting, manufacturing, and aiding in the construction and manufacture of a certain multiple record phonograph, or talking machine, and agrees to pay him for such services the sum of $1,890, in equal weekly installments of $60 each, with the understanding that at the expiration of this contract at the option of said first party, the said employment may be extended for further periods.

"*Second,* Said second party hereby accepts the foregoing employment upon the terms specified herein and agrees to give

---

1. The opinion of the court in Kenyon v. Automatic Instrument Co., 6 Cir., 160 F.2d 878, should be read prefatory to consideration of this opinion.

all of his time and his best efforts to making his said employment mutually beneficial, and said second party further agrees that he will at all times heed and obey and follow the orders and instructions of the officers of the said first party, and of their factory executives, and will to the fullest extent of his ability, cooperate with them for the purposes for which he is employed.

"*Third,* Said second party represents that he is the inventor of the said multiple disc phonograph above referred to and represents that he will attempt, or the said first party may in his name attempt to cover the mechanism and operation and the functioning of said phonograph as hereinbefore noted, by proper letters patent to be issued as soon as may be by the United States of America. In the event that said patents are obtained by either said first or second party the title thereto and all interest therein shall be the property of and belong to said first party and the said second party does hereby give and grant, sell and assign unto said first party the exclusive right to make, manufacture, market, vend and operate the said phonograph, under his present rights and under future letters patent, according to the terms hereof, in any manner which it may desire to do, and covenants to and with the said first party that performing its obligations under this contract it shall have, hold, and enjoy all the rights, benefits, titles and returns of and from said invention, and that he will when so requested by said first party, duly and properly sign, seal, execute and deliver unto said first party proper assignments and any rights which may hereafter accrue under and by virtue of said invention.

"*Fourth,* In consideration of the foregoing assignments and licenses, the said first party agrees that for each of said machines manufactured by it, it will on or before the tenth day of the month succeeding the completion of such machine, pay to the order of the said second party, in good and lawful money of the United States of America, the sum of Five Dollars. The terms, agreements and covenants in this contract contained are made contingent upon the assurance of the said second party that his invention and the applications for patents thereon may not be attacked before any court, commission, department, or bureau for infringement of other patents, and should such difficulties or litigation arise, then the terms of this contract shall be, from that moment, null and void, unless the said second party shall be vindicated in such action.

"*Fifth,* The terms upon which the license to manufacture and the assignment of prospective patents upon the said phonograph are given shall be and remain in force during the life and continuance of any or all patents issued upon the said mechanism to said second party, his heirs, or assigns.

"In witness whereof said first party has caused these presents to be signed by its duly authorized officers and its corporate seal to be affixed; and said second party has hereunto set his hand and seal at the city of Grand Rapids, Michigan, the day and year first above mentioned.

"Automatic Musical Instrument Co.
"By W. Ioor, Pres.
"S. D. Thompson, Secy.
"Bertram C. Kenyon
"In the presence of:
"W. W. Boa
"Erwin M. Treusch."

"Memorandum

"As an addendum to the contract dated December 7, 1925, to which this memorandum is attached, it is understood and agreed that the said first party will manufacture as many of said multiple record phonographs as is consistent with their business policies and, subject to their complete satisfaction and proper performance of the said phonographs when completed, the said first party undertakes and agrees to pay to said second party the minimum sum of $1,000 per year, for five years, from and after the commencement of manufacture of said phonograph, on the basis mentioned in said paragraph fourth, which guarantee, when, if and as paid, shall apply on the basis of five dollars, per machine as therein mentioned.

"This memorandum has been initialed by the parties of the contract to which it is attached at the time of execution of same.

"Dated Dec. 7, 1925.   W. I.   S.D.T. B.C.K."

This contract provided that it was to continue in force during the life of all patents issued to Kenyon on the phonograph mechanism therein referred to, and that the Delaware corporation would pay him a royalty of $5 "for each of said machines" it manufactured.   The contract contemplated the obtaining of a patent on the phonograph mechanism, and on July 15, 1927, Kenyon, Wilmur W. Boa, and Clifford H. Green filed application for such patent.   On September 27, 1932, Letters Patent No. 1,879,693 for an "automatic sound reproducing instrument" (herein referred to as the Kenyon patent) was issued to the Delaware corporation as assignee of Kenyon, Boa, and Green.[2]   The parties continued under the contract until February, 1931, and during that time the corporation manufactured machines referred to as models P, Z, J, and K, which were within the claims of the Kenyon patent application, and paid him royalties of about $48,000.   On February 10, 1931, this court, in proceedings by a general creditor, appointed a receiver for the Delaware corporation, and in February, 1933, the assets of that company, including the Kenyon patent, were sold and assigned to the Automatic Musical Instrument Company, a newly organized Michigan corporation and predecessor of the defendant.[3]

The manufacture of models P, Z, J, and K was discontinued at the time of the receivership in 1931, and the tools and dies used in their manufacture were later scrapped.   During the receivership and thereafter a new model of phonograph generally referred to as the ARC model was designed and developed, which had a substantially different mechanism for changing records, and which required new tools and dies for its manufacture.   This new model was put on sale about 1934, and the defendant (the Michigan corporation) continued its manufacture until about June, 1946, when it changed to the 500 model.   Kenyon made no claim for royalties on the ARC model until October 3, 1941, when his attorneys wrote defendant demanding an accounting and payment.   Kenyon died shortly thereafter, on October 18, 1941, and his wife, plaintiff Blanche M. Kenyon, was appointed executrix of his estate.

Defendant refused to pay the royalties claimed, and on January 22, 1945, plaintiff filed complaint in the present case, alleging in substance that the machines manufactured by defendant were within the claims of the Kenyon patent and that under the December 7, 1925, contract it was obligated to pay a royalty of $5 on each machine.   Defendant answered, denying liability, and filed motion to dismiss on the ground that it was not obligated under the 1925 contract between Kenyon and the Delaware corporation.   The court dismissed the complaint, holding that the contract was a nonassignable, executory contract; that it never became an obligation of the receiver of the Delaware corporation; and that the defendant was not obligated thereunder.   The plaintiff appealed, and the appellate court reversed and remanded the case for further proceedings 6 Cir., 160 F.2d 878.   In its opinion the Court of Appeals held that the contract constituted an assignment of Kenyon's rights in the invention, with an agreement back for royalties; that the receiver appointed in 1931 took the assets of the Dela-

---

**2.** It appears that Boa and Green do not claim any interest in the patent or in this litigation.

**3.** This Michigan corporation was organized in 1932 as the Fifteen Hundred Union Avenue Corporation; later its name was changed to Automatic Musical Instrument Company; in 1937 this was changed to Automatic Instrument Company; and in 1946 to A M I Incorporated.

In 1941 defendant filed petition under chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq., for an arrangement with its creditors.   Defendant was allowed to remain in possession, and as the proceedings were concluded without affecting the substantive rights of the parties in the present case, they are not discussed in this opinion.

ware corporation, burdened with the obligations of the contract; and that when defendant purchased the assets, including the Kenyon patent, from the receiver, it took them subject to the contract obligations. The determination of these issues by the appellate court cannot be relitigated by this court on remand.

Therefore, the only question now before this court is whether or not the defendant is obligated under the contract of December 7, 1925, to pay plaintiff the specified royalty on phonographs which it manufactured subsequent to October 18, 1935,[4] and prior to April 7, 1947, when it filed petition for reorganization under chapter X of the Bankruptcy Act. This question, which was not before the Court of Appeals, must be determined from an examination of the contract, the Kenyon patent, the prior art, the machines manufactured by defendant, and the acts and dealings of the parties. During the period prior to April 7, 1947, the defendant had ·manufactured 9,738 phonographs referred ·to as the ARC model (defendant's exhibit A) and 5,663 phonographs referred to as the 500 model (defendant's exhibit B).

Under the 1925 contract as construed by the appellate· court, defendant stands in the position of a licensee under the Kenyon patent, and as a licensee it is estopped to deny the validity of the patent. Stubnitz-Greene Spring Corp. v. Fort Pitt ·Bedding Co., 6 Cir., 110 F.2d 192; Drackett Chemical Co. v. Chamberlain Co., 6 Cir., 63 F.2d 853; Midland Steel Products Co. v. Clark Equipment Co., D.C., 75 F.Supp. 143, affirmed 6 Cir., 174 F.2d 541. However, the prior art may properly be considered to determine the scope of the patent claims. Casco Products Corp. v. Sinko Tool & Mfg. Co., 7 Cir., 116 F.2d 119; Stubnitz-Greene Spring Corp. v. Fort Pitt Bedding Co., supra; Midland Steel Products Co. v. Clark Equipment Co., supra.

At the trial the parties stipulated that the question—whether or not the mechanisms of defendant's phonograph models were within the claims of the Kenyon patent—concerns only "the record changer, that is, the mechanism for transferring records from a bank of records onto the turntable for playing and then returning them from the turntable to the bank after playing, to which the claims of the Kenyon, Boa, and Green patent No. 1,879,693 relate." Therefore, to decide whether defendant is obligated for royalties under the 1925 contract, it is first necessary to determine if the record-changing mechanisms of its ARC and 500 models are within the scope and claims of the Kenyon patent. Plaintiff contends that these models embody the invention referred to in the contract; that they are constructed substantially as described in the Kenyon patent; and that defendant is obligated to pay the specified royalties thereon.[5] On the other hand, defendant contends that said models are outside the claims of the Kenyon patent; that the record-changing mechanisms employed in them are fundamentally and substantially different in principle, structure, and mode of operation from that described in the patent; and that it is not liable for the royalties claimed. The burden is on plaintiff to establish that the record-changing mechanisms of defendant's machines are within the claims of the Kenyon patent. If the mechanisms are not within such claims, then defendant is not obligated for royalties under the 1925 contract.

The scope of the Kenyon patent is limited to the invention described in the claims, when read in the light of the specifications and drawings. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1817, Ann.Cas.1918A 959; Decker v. Federal Trade Commission, D.C. Cir., 176 F.2d 461. The principal result or function of the patented mechanism is to

---

4. Beginning of six-year limitation period prior to the death of Kenyon on October 18, 1941. Comp.Laws Mich.1948, § 609.-13, Stat.Ann. § 27.605.

5. It was stipulated that the structures illustrated and described in two other Kenyon· patents, Nos. 1,772,901 and 1,-996,338, are not in anywise involved in this case.

select and transfer a phonograph record from a rack or bank of records onto a turntable and, after playing, to return it to the rack or bank. However, this end result, which had been accomplished by prior-art mechanisms,[6] is not patentable—only the device or mechanism accomplishing the result being patentable. Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 556, 18 S.Ct. 707, 42 L.Ed. 1136; Decker v. Federal Trade Commission, supra; Midland Steel Products Co. v. Clark Equipment Co., supra. Study of the prior art indicates that the Kenyon patent is in a crowded field and accomplishes an old result. Therefore, its claims for a record-changing mechanism must be narrowly construed and limited in scope to the particular principles and mechanism therein described.

The Kenyon patent contains 21 claims, and as the plaintiff did not specify the particular ones on which she relied, claims 7, 8, 11, 13, and 17 are set forth in the margin as being fairly illustrative.[7] The pat-

6. Nelson 1,595,241, application Nov. 26, 1923, issued Aug. 10, 1926; Seal 1,741,040, application May 24, 1922, issued Dec. 24, 1929; Green 1,752,170, application Sept. 15, 1921, issued Mar. 25, 1930.

7. "7. In a sound-reproducing instrument of the character described: a horizontal turntable; a stationary rack adapted to hold in horizontally spaced relation a plurality of record disks in positions wherein their sides are disposed vertically and in the turntable's radial directions; an arm swingable concentrically with the turntable; a member carried by the arm turnably about a horizontal axis transverse the arm; record disk-gripping means carried by said member turnably about an axis transverse the first-mentioned axis and comprising gripping jaws; a rod slidable in said member in the direction of the second-mentioned axis for operating the jaws, and having inclined rack teeth; a rod slidable in the arm transversely to the first-mentioned rod and having inclined rack teeth meshing with the rack teeth of the first-mentioned rod to slide the same."

"8. In a sound-reproducing instrument of the character described: a horizontal turntable; a stationary rack adapted to hold in horizontally spaced relation a plurality of record disks in positions wherein their sides are disposed vertically and in the turntable's radial directions; an arm swingable concentrically with the turntable; a member carried by the arm turnably about a horizontal axis transverse the arm; record disk-gripping means carried by said member turnably about an axis transverse the first-mentioned axis and comprising gripping jaws; a rod slidable in said member in the direction of the second-mentioned axis for operating the jaws; a rod slidable in the arm transversely to, and engaging, the first-mentioned rod to slide the same, the first-mentioned rod comprising swival-connected portions."

"11. In a sound-reproducing instrument of the character described: a horizontal turntable; a stationary rack adapted to hold in horizontally spaced relation a plurality of record disks in positions wherein their sides are disposed vertically and in the turntable's radial directions; an arm swingable concentrically with the turntable and carrying means for gripping a record disk in the rack, raising it therefrom, turning it to a sidewise horizontal position, depositing it in playing position on the table and releasing it; means for swinging the arm to positions registering with the respective record disks in the rack; means controlling said arm-swinging means comprising a rotatable drum having spaced projections and a plurality of coin chutes, the projections and the coin chutes corresponding to said positions respectively."

"13. In a sound reproducing instrument of the class described the combination of a horizontal turntable, a rack spaced outwardly from the turntable in its radial direction for holding a plurality of disk records in vertical edgewise position, record transfer mechanism comprising a pair of jaws for gripping the opposite sides of the marginal edge of a record, means for causing relative movement parallelly to the turntable between said transfer mechanism and said record rack so that selected records may be removed from said rack, means for projecting said jaws outwardly and closing them to gripping position, and means for moving said jaws bodily to transfer a record from said rack to said turntable."

"17. A record transfer mechanism comprising a support, a body member journalled on said support and having an axial bore therethrough, a sleeve mounted on said body member with the axis thereof perpendicular to the axis of said body member, a pair of jaws pivoted on said sleeve, an axially extend-

ent describes a record-changing mechanism in a sound-producing instrument, comprising a horizontal turntable; a stationary arcuate record rack for holding a plurality of disk records in vertical edgewise spaced relation with their sides radially disposed with respect to the turntable; a selector arm horizontally swingable on an axis concentric with the axis of the turntable; a pair of gripping jaws carried by the selector arm, with means for projecting said jaws outwardly and for closing them to grip the opposite sides of the marginal edge of a record; means for rotating the selector arm so as to turn the gripped record from a vertical to a horizontal plane and deposit it on the turntable in playing position; and means for moving said parts reversely to return the record to its initial position in the rack.[8] The testimony is undisputed that this record-changing mechanism used by the Delaware corporation in its P, Z, J, and K models prior to 1931, did not work satisfactorily. The principal difficulties with the mechanism were the indefinite registration of the swingable arm in replacing records in the rack; the breakage of the gripper jaws; the breakage of records when of different thicknesses; the swinging of the selector arm while the gripper jaws were projected, causing breakage of records in the rack; the inability to handle warped records; and the failure of the gripper jaws to function properly, for the reason that they gripped the record at only one point.

As hereinbefore mentioned, the manufacture of models P, Z, J, and K was discontinued at the time of the receivership of the Delaware company in 1931. The testimony establishes that the receiver, with the approval of the court, began development of a new model of phonograph generally referred to as the ARC model, with a different mechanism for changing records. This development was carried forward by the Michigan company, which had acquired the assets of the Delaware corporation, including the Kenyon patent, from the receiver. New tools and dies were required in the manufacture of this model, and parts from prior machines could not be used. Defendant continued to manufacture the ARC model until 1946, when it changed to model 500, which had a different mechanism for controlling the movement of the record rack. The question is—are the record-changing mechanisms in defendant's ARC and 500 models within the scope and claims of the Kenyon patent?

In comparing the mechanism of defendant's accused machines with the claims of the Kenyon patent, it should be noted that the patent describes a record-changing mechanism comprising, among other things, a stationary arcuate record rack; a horizontally swingable selector arm, which selects the record in the rack; pincer-like jaws for pressure-gripping the opposite marginal sides of a record; and that the selector arm travels in a different path for the selection of each record. In defendant's machines the record rack moves horizontally in a straight line to bring the selected record to a positive registration point, where it is picked up by a transfer mechanism and placed on the turntable; the arm of the record-transfer mechanism is not swingable but moves in a single fixed path; the arm is provided with V-shaped brackets which move simultaneously toward opposite peripheral edges of the record, thereby holding it between the brackets without side clamping or pressure. To summarize: In the Kenyon mechanism the record rack is stationary—in defendant's it is movable; in Kenyon the selector arm is swingable in a different path for each record—in defendant's the record-

ing shaft slidable in said sleeve for simultaneously projecting said jaws outwardly and closing them to grip a record, an axially extending plunger slidable in said body member bore for actuating said shaft, and means for rotating said body member to carry said jaws from a record engaging position to a record depositing position."

8. The mechanism for record-selector control is not involved in this case, as the parties stipulated that the issue herein concerns only the record-changing mechanism to which the claims of the Kenyon patent relate. Furthermore, the mechanism for selector control is shown in prior-art patent, Green 1,752,170.

609

transfer arm moves in a single fixed path; in Kenyon the selector arms 'moves to the rack and selects the record—in defendant's the rack moves to a positive registration point on the fixed path of the arm, and the arm picks up whatever record is presented to it; in Kenyon the jaws pressure-grip opposite sides of the record at only one point—in defendant's two brackets on the transfer arm engage the record at two points on opposite peripheral edges. This record-transfer mechanism of defendant's model ARC is shown in Green patent 2,-104,032 issued January 4, 1938, on application filed February 20, 1934.

The above discussion as to the difference between the record-changing mechanism described in the claims of the Kenyon patent and that employed in defendant's ARC model is applicable to the mechanism of its 500 model, except that in this later model the record rack or magazine is moved by a separate electric motor automatically controlled by a circuit breaker on the rack itself, so that the rack stops instantly when the breaker strikes one of the stop fingers positioned under the rack. The mechanism in defendant's 500 model is shown in Vanderzee patent application (defendant's exhibit D).

■ The same end result, that is, the changing of records, is achieved by the mechanism described in the Kenyon patent and by the mechanisms in defendant's machines, but in defendant's machines this result is obtained in a far more satisfactory manner by fundamentally and substantially different means and modes of operation, and not by equivalent mechanisms or means. Because of the difference in structure, function, and mode of operation, the record-changing mechanism in defend-

ant's machines is not a mere reversal of the parts described in the Kenyon patent, as the doctrine of reversal of parts can be applied only when the reversal can be made without change of parts or the functions of parts. Dalton Adding Mach. Co. v. Rockford Milling Mach. Co., 7 Cir., 267 F. 422. From examination of the Kenyon patent and the mechanisms of defendant's ARC and 500 models, the court is convinced that the record-changing mechanisms in these models are not within the claims of the Kenyon patent.

■ The plaintiff contends that defendant is liable for royalties under the December 7, 1925, contract, because it placed a patent notice on its ARC models stating: "This device is manufactured under one or more of the following patents," listing 14 patents, including Kenyon. This notice did not necessarily indicate that the device was manufactured under the Kenyon patent. As a matter of fact, the parties stipulated in writing that the construction and operation of the record-changing mechanism in defendant's ARC model was illustrated and described in Green patent 2,104,032.[9] In view of its decision that the record-changing mechanisms employed in defendant's accused machines are not within the claims of the Kenyon patent, the court concludes that the above patent notice does not impose liability on defendant for royalties on its ARC model.

As Kenyon was a stockholder in the new Michigan corporation organized in 1932, attended organization meetings, corresponded with the company regarding dividends, and knew of the manufacture of the ARC model, it is significant that he made no claim that the mechanism of that model was within his patent, and made no claim

9. "It is stipulated by and between the parties, as follows:

"1. The record changer in defendant's machine, marked 'defendant's exhibit A,' identified as model ARC, is representative of the record changer made by defendant in the period from October 18, 1935, through May 31, 1946. This record changer, its construction and operation, is illustrated and described in the Green patent No. 2,104,032, filed February 20, 1934, and issued January 4, 1938, a copy of which is marked 'defendant's exhibit C.'

"2. The record changer in defendant's machine, marked 'defendant's exhibit B,' identified as model 500, is representative of the record changer made by defendant since June 1, 1946. This record changer, its construction and operation, is shown and described in the drawings and specifications of the Vanderzee patent application, a copy of which is marked 'defendant's exhibit D.' "

for royalties until a few weeks before his death many years later. His failure to claim royalties during the seven years or thereabouts after the ARC model was put in production is certainly indicative of his understanding and belief that said model was not within his contract or the claims of his patent.

In summary, the court concludes (1) that the record-changing mechanisms in defendant's ARC and 500 models are not within the claims of the Kenyon patent relating to a record-changing mechanism; and (2) that defendant is not liable for the royalties claimed by plaintiff on said ARC and 500 models. In view of the court's conclusions, other questions do not require consideration or determination. A decree will be entered in accordance with this opinion.

## Findings of Fact

1. Bertram C. Kenyon was one of the inventors of the phonograph record-changing mechanism referred to in the contract of December 7, 1925, and described in patent No. 1,879,693 issued September 27, 1932, to the Delaware corporation as assignee of Kenyon and others.

2. The record-changing mechanism described in the Kenyon patent was employed in models P, Z, J, and K manufactured prior to 1931 by the Automatic Musical Instrument Company, a Delaware corporation. A receiver was appointed for the Delaware corporation on February 10, 1931; the manufacture of said models was discontinued; and the tools and dies used in their manufacture were later scrapped.

3. The record-changing mechanism described in the Kenyon patent and employed in models P, Z, J, and K did not work satisfactorily, caused considerable trouble and expense, and its manufacture was discontinued.

4. The defendant acquired the assets of the Delaware corporation, including the Kenyon patent, from the receiver thereof, and the Court of Appeals in Kenyon v. Automatic Instrument Co., 6 Cir., 160 F. 2d 878, held, in effect, that defendant took the assets subject to the obligations of the December 7, 1925, contract between Kenyon and the Delaware corporation.

5. The receiver of the Delaware corporation, acting in pursuance of court order, and the defendant company, designed and developed a new phonograph generally referred to as the ARC model, with a record-changing mechanism fundamentally and substantially different from that described in the Kenyon patent and from that employed by the Delaware corporation in models P, Z, J, and K prior to 1931; the defendant began the manufacture and sale of its new model ARC in 1934, and continued its manufacture until 1946, when it changed to model 500.

6. The record-changing mechanisms in defendant's ARC and 500 models are fundamentally and substantially different from the record-changing mechanism described in the Kenyon patent and employed by the Delaware corporation in models P, Z, J, and K prior to 1931.

7. The record-changing mechanisms employed by defendant in its ARC and 500 models are not within the scope and claims of the Kenyon patent or within the invention referred to in the 1925 contract.

8. The record-changing mechanisms in defendant's ARC and 500 models are not equivalents of the mechanism described in the Kenyon patent and are not a mere reversal of the parts of the Kenyon mechanism.

9. Although Bertram C. Kenyon knew of the develpment and manufacture of the ARC model, he made no claim for royalties until a few weeks before his death in 1941.

## Conclusions of Law

1. The court has jurisdiction of the parties and of the subject matter of this suit.

2. The defendant acquired title to the Kenyon patent from the receiver of the Automatic Musical Instrument Company, a Delaware corporation, subject to the obligations of the December 7, 1925, contract between Bertram C. Kenyon and that corporation. Kenyon v. Automatic Instrument Co., 6 Cir., 160 F. 2d 878.

3. As the defendant is obligated under the December 7, 1925, contract, it is there-

fore a licensee under the Kenyon patent and, as a licensee, it is estopped from denying the validity of that patent.

4. The prior art may be considered in determining the scope of the claims of the Kenyon patent.

5. The Kenyon patent is in a crowded field of the art and is entitled to only a limited range of equivalents.

6. The record-changing mechanisms employed in defendant's ARC and 500 models are fundamentally and substantially different from the record-changing mechanism described in the Kenyon patent.

7. Bertram C. Kenyon was not entitled to royalties on defendant's ARC model.

8. Plaintiff is not entitled to royalties on defendant's ARC and 500 models.

9. Defendant is entitled to a decree dismissing plaintiff's complaint.

10. Defendant is entitled to recover court costs.